645 P.2d 891

In the Matter of the Application of
Helen TRUE for a Writ of
Habeas Corpus.

Helen TRUE, Appellant,

v.

STATE of Idaho, DEPARTMENT OF
HEALTH AND WELFARE,
Respondents.

No. 13207.

Supreme Court of Idaho.

May 26, 1982.

Michael H. Hinman and Russell E. Webb, Idaho Falls, for appellant.

David H. Leroy, Atty. Gen., Boise, K. Randall Smith, Asst. Atty. Gen., Idaho Falls, for respondents.

McFADDEN, Justice.

## ON REHEARING

The previous opinion in this case is hereby withdrawn; the following opinion is substituted in lieu thereof.

Helen True appeals from an order entered by the district court quashing a writ of habeas corpus. The return on the writ of habeas corpus discloses that the appellant is a patient at State Hospital South in the custody of the Idaho Department of Health and Welfare pursuant to a judicial hospitalization order dated December 30, 1971. It is undisputed that at some point in time following the appellant's being placed in the custody of the department she was placed on conditional release (outpatient) status, but was then summarily returned to State Hospital South for rehospitalization on August 22, 1974.

The appellant subsequently instituted the instant habeas corpus proceedings on August 31, 1978, challenging the constitutionality of her rehospitalization. The issue before us is whether due process principles enunciated by the United States Supreme Court in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972),[1] dictate that a patient committed to the custody of the Department of Health and Welfare but who has been conditionally released from institutional hospitalization must be afforded written notice and a hearing prior to the revocation of his conditional release status.

At the time the appellant was rehospitalized, then in effect I.C. §§ 66–338 and 339 (1974),[2] governed the conditional release of those persons committed to the custody of the Department of Health and Welfare. I.C. § 66–338(a) (1974) authorized the director of the department or his designated representative to "release an improved patient on the condition that he receive outpatient treatment or on such other reasonable conditions as may be specified." However, an improved patient's conditional release status could be revoked in two situations. First, a conditionally released patient could be immediately rehospitalized in the event the patient had failed to fulfill the conditions of his release and the director of the department or his designated representative "ha[d] reason to believe that conditions justifying hospitalization continue[d] to exist." I.C. § 66–338(b) (1974). Second, the director of the department or his designated representative could order the immediate rehospitalization of a conditionally released patient in the event it was reported "by any two (2) persons who are either licensed phy-

1. In *Morrissey* two convicts alleged that they were denied due process because their paroles had been revoked without a hearing. The court agreed, holding that due process requires a reasonably prompt informal inquiry conducted by an impartial hearing officer near the place of the alleged parole violation or arrest prior to revocation. The purpose of the hearing is to determine if there is reasonable ground(s) to believe that the parolee has violated a condition of his parole. At the revocation hearing the minimum due process requirements are:

    "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of the evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to con-

front and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." *Morrissey, supra* 408 U.S. at 489, 92 S.Ct. at 2604, 33 L.Ed.2d at 499.

2. In 1981, the Idaho Legislature amended I.C. §§ 66–338 and 339. Although the changes in the statutory language are slight, the court notes that the opinion is limited to a discussion of I.C. §§ 66–338 and 339 as they read at the time of the appellant's rehospitalization.

sicians, health officers, designated examiners or peace officers, the prosecuting attorney or a judge of a court ... [that the patient] ha[d] relapsed and [was] again in need of hospitalization. I.C. § 66–339 (1974). Inherent to both situations was a determination that the conditions warranting hospitalization of the patient in the first instance were again present, *i.e.,* the patient was mentally ill or mentally retarded and because of his ailment was likely to injure himself or others. *See* I.C. § 66–329(i)(1), (2) (1974). In both situations the order of rehospitalization was *ex parte,* and when indorsed by a judge authorized the immediate detention of the patient. I.C. §§ 66–338(b) and 339 (1974).

The Department of Health and Welfare argues that the summary procedure for revocation of an improved patient's conditional release status contained in I.C. §§ 66–338(b) and 339 (1974) withstands due process scrutiny on the dual grounds that: (1) the state's interest in protecting society from the patient and the patient from himself by way of proper, uninterrupted treatment outweighs any deprivation to the patient when he is rehospitalized; and (2) the provision for post-rehospitalization judicial review contained in I.C. § 66–340 (1974), in addition to matters which might be brought to the court's attention by way of habeas corpus (I.C. § 66–347) provides adequate safeguards against arbitrary state action. Underlying the argument is the view that the decision to rehospitalize a patient who has been conditionally released from the custody of the Department of Health and Welfare is predominantly a medical determination; a determination which should not be unduly interfered with by the judiciary.

■ A careful and thorough review of the applicable propositions of law and relevant case law, however, inescapably lead us to the conclusion that a patient who has been conditionally released from institutional hospitalization possesses a liberty interest which is entitled to due process safeguards. While the entire panoply of procedures outlined in *Morrissey* are not appropriate in this context, we are of the opinion that at a minimum the following procedures are constitutionally mandated: (1) prompt written notice; and (2) a revocation hearing before a neutral hearing body to be held as soon as is reasonably possible following the patient's rehospitalization. Insofar as the language of I.C. §§ 66–338(b) and 339 (1974) exclude the necessity of notice and a hearing, they fail to pass constitutional scrutiny.

## I

■ The United States Supreme Court has settled on a two-step analysis in determining the dictates of due process: (1) is the specific interest threatened by government action within the contemplation of the liberty or property language of the Fourteenth Amendment; and (2) assuming the existence of such an interest, what process is due. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The initial determination of whether an individual is entitled to any procedural protection involves an examination of the extent to which the person "will be 'condemned to suffer grievous loss.' [citations omitted]," (*Morrissey v. Brewer, supra,* 408 U.S. at 481, 92 S.Ct. at 2600, 33 L.Ed.2d at 494), by the allegedly arbitrary action of the state. This determination necessarily entails inquiring whether the asserted interest being threatened by state action is within the scope of the liberty or property language of the Fourteenth Amendment. *Board of Regents v. Roth, supra,* 408 U.S. at 370–71, 92 S.Ct. at 2705–06, 33 L.Ed.2d at 557. As to the nature of this inquiry, one commentator has observed:

"Determining the existence of these new entitlements depended on construction of the relevant statutes, and of the pertinent understandings between government and individuals, rather than on any balancing of interests; the existence of an entitlement turned not on 'the weight but [on] the nature of the interest

at stake.' The Court appears, therefore, to have placed great emphasis both on making it possible for those who deal with the government in any way to rely on any clearly announced rules, and also on reducing the helplessness of persons who are in a dependent relationship to government with respect to basic needs. As to the latter in particular, the Court has evidently sought to assure that government decisions about needs are reasonably accurate and that individuals have a personal chance to be heard when vital necessities are at stake. Moreover, the Court appears to have proceeded on the premise that, when a reduction in helplessness requires participation in hearings, the cost in dollars cannot be accepted as a sufficient reason to proceed by discretionary choice, since due process will always involve administrative burdens of that sort." Tribe, American Constitutional Law, § 10–9, at 515–16 (1978).

■■■ "[O]nce it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer, supra,* 408 U.S. at 481, 92 S.Ct. at 2600, 33 L.Ed.2d at 494. As to this question, the court has stressed that "[t]he very nature of due process negates any concept of inflexible procedures applicable to every imaginable situation." *Id.,* quoting *Cafeteria & Restaurant Workers Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Additionally, the court has insisted that the procedures needed will vary according to specific factual contexts, since "not all situations calling for procedural safeguards, call for the same kind of procedure." *Morrissey v. Brewer, supra,* 408 U.S. at 481, 92 S.Ct. at 2600, 33 L.Ed.2d at 494. In *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18, 32–33 (1976), the court announced a general formula for the determination of what process is due:

"[O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

■ In summary, the approach is utilitarian, requiring a preliminary showing that the asserted interest is a cognizable interest under the Fourteenth Amendment, and then requiring a balancing of the relative interests of the individual and the state. The foregoing approach has been adhered to by this court in numerous cases. *See, e.g., Bowler v. Board of Trustees of School Dist. No. 392,* 101 Idaho 537, 617 P.2d 841 (1980); *Jones v. State Board of Medicine,* 97 Idaho 859, 555 P.2d 399 (1976).

II

Applying the first level of the test and scrutinizing the interest of a conditionally released mental health patient, the court in *Meisel v. Kremens,* 405 F.Supp. 1253, 1256 (E.D.Pa.1975) concluded that:

"At issue in the instant case is not the absolute liberty a person alleged to be mentally ill enjoys prior to his initial commitment to a mental institution, but rather the 'conditional liberty' enjoyed by a person who, after commitment to a mental institution, is then released on parole.... The liberty at stake in a civil commitment proceeding is as valuable an interest as the liberty at stake in a criminal trial. *In re Ballay, supra* [D.C.Cir. 482 F.2d 648] at 668; *Heryford v. Parker, infra,* [10th Cir. 396 F.2d 393] at 396; *Lessard v. Schmidt, infra,* 349 F.Supp. [1078] at 1090. And the Supreme Court has unanimously held that the 'conditional liberty' of the paroled criminal falls within the scope of the Fourteenth Amendment and is entitled to the protection of the Due Process Clause. *Morrissey v. Brewer, supra,* 408 U.S. at 482, 92 S.Ct. 2593 [at 2600]. A New York appel-

late court has recently applied the principles of *Morrissey* to the revocation of the aftercare status of drug dependent persons, *Ball v. Jones*, 43 A.D.2d 281, 351 N.Y.S.2d 199 (1974), and the rationale of that decision has been adopted by a federal district court, *Government of the United States ex rel. Shaban v. Essen*, 386 F.Supp. 1042 (E.D.N.Y.1974). For my part, I cannot see how the 'conditional liberty' of the paroled mental patient differs in any significant respect from the 'conditional liberty' of the paroled criminal or the paroled drug dependent person. Accordingly, I hold that the former likewise falls within the scope of the Fourteenth Amendment and must be protected by the constitutional safeguards of due process."

The rationale of the *Meisel* decision was followed by another federal district court in the case of *Lewis v. Donahue*, 437 F.Supp. 112 (M.D.Okla.1977). In *Lewis*, the plaintiff was involuntarily committed to an Oklahoma state mental hospital, and eight days later she was released and placed on outpatient aftercare status. Two and one half months later she was rehospitalized pursuant to Section 73 of Title 43A of the Oklahoma statutes, which provided for the revocation of outpatient aftercare status by way of judicial order, issued summarily, upon *ex parte* application. The court held that the patient in question had a constitutionally protected interest in her conditional liberty, and that the statutory scheme for rehospitalization denied due process because it permitted revocation without notice or opportunity to be heard before rehospitalization. *Id.* at 114. In reaching its conclusion, the court stated:

"The granting of out-patient standing did change plaintiff's situation—she ceased to be a person who was institutionalized and became a person permitted to enjoy a substantial degree of liberty. Conversely, revocation of leave effected an involuntary transfer from a relatively non-restrictive environment to a restrictive one, and a correlative deprivation of a measure of freedom.

The [statute requires] that release, or conditional release, of a patient be predicated upon a determination made by an appropriate authority that the patient is either restored to mental health, or that institutionalization is no longer likely to be beneficial and that patient's discharge will not be detrimental to his, or the public's welfare. In the latter instance, involuntary medical treatment may, but need not, continue. Thus, an out-patient's enjoyment of his liberty is conditioned only upon his not again becoming a danger to himself or others.

A leave may properly be indeterminate, or terminable upon the happening of certain conditions. But it cannot be denied that conditional, as well as absolute, rights fall 'within the contemplation of the "liberty or property" language of the Fourteenth Amendment.' *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). See also *Meisel v. Kremens*, 405 F.Supp. 1253 (E.D.Pa.1975)." *Id.*

The concept that "conditional liberty" falls within the ambit of protection afforded by the due process clause of the Fourteenth Amendment has been recognized in two analogous fact situations. The first of these two cases is *Ball v. Jones*, 43 A.D.2d 281, 351 N.Y.S.2d 199 (1974), *aff'd* 36 N.Y.2d 339, 368 N.Y.S.2d 467, 329 N.E.2d 159 (1975). In *Ball*, the petitioners had been placed in the custody of the New York Narcotic Addiction Control Commission for inpatient care, and were thereafter released on aftercare (outpatient) status. Following various incidents, their outpatient status was summarily revoked. Citing *Morrissey*, the court held that the principles announced therein were sufficiently broad to encompass the revocation of outpatient status because return to inpatient status inflicts as "grievous" a loss as does revocation of parole. 351 N.Y.S.2d at 203–04.

Similarly, in *In re Bye*, 12 Cal.3d 96, 115 Cal.Rptr. 382, 524 P.2d 854 (1974), *cert. denied*, 420 U.S. 996, 95 S.Ct. 1437, 43 L.Ed.2d 679 (1975), the petitioner, a narcotics addict, had his outpatient status summarily re-

voked by the California Narcotic Addict Evaluation Authority. The California Supreme Court reasoned:

"Similar to the parolee, the CRC outpatient may lead a relatively normal life while in his conditional status. That status, albeit subject to revocation, 'enables him to do a wide range of things open to persons who have never been convicted of any crime.' Although the outpatient may be required to submit to periodic and surprise testing for narcotic use and may also be ordered to maintain close contact with a specially trained parole agent, he retains his civil rights [citations omitted] and is not considered 'civilly dead' for certain purposes as is the parolee whose conditional liberty interest has heretofore been deemed protected. Equally important, as in the case of the parolee, the outpatient has relied on the state's promise that his conditional liberty will not be revoked unless he fails to abide by the conditions of his release and he is obligated to control his conduct accordingly.

. . . .

Although the Legislature has denominated the narcotic rehabilitation plan 'civil' rather than 'penal' the use of one label rather than the other does not alter the applicability of due process protections to the outpatient's conditional liberty interest." 115 Cal.Rptr. at 386, 524 P.2d at 859.

The court then concluded that the petitioner is entitled to certain procedural due process safeguards to protect his conditional liberty status from arbitrary revocation. *Id.*

The views expressed in the cases of *Meisel* and *Lewis*, and the analogous cases of *Ball* and *Bye*, are not universally shared by other courts. In *Dietrich v. Brooks*, 27 Or. App. 821, 558 P.2d 357 (1976), the Oregon Court of Appeals did not find that state's conditional release statute unconstitutional. In *Dietrich* the appellant was involuntarily

committed to an Oregon state mental hospital, and several months later conditionally released on a "trial visit." Thereafter, he was returned to the hospital after two persons signed an affidavit requesting revocation of the patient's leave. The patient challenged the statute and his rehospitalization as violating due process.[3] The court impliedly recognized that a mental health patient while on conditional release has a protectible "conditional liberty" interest under the Fourteenth Amendment. *Id.* at 356–60. However, the court opined that there were "profound differences of nature, degree and function between [parole and conditional release] which [made] . . . different due process considerations appropriate." *Id.* at 360. Specifically, the court noted three distinctions: (1) the underlying nature of imprisonment and parole is penal, while conditional release is a therapeutic device; (2) the length of the deprivation of liberty differs, and (3) the relationship between the conditional liberty and the institutional program was greater with conditional release than with parole. *Id.* Thus, the court held that when looking at the overall statutory scheme of involuntary commitment, the procedural protections afforded the patient upon summary revocation of conditional release were adequate. *Id.* at 361.

Similarly, in *Hooks v. Jaquith*, 318 So.2d 860, 862 (Miss.1975), the Mississippi Supreme Court held that a mental health patient, whose conditional release status had been revoked, was not entitled to habeas corpus relief on the theory that he was unlawfully deprived of his liberty because the "leave" had been terminated without a prior hearing. In so holding, the court stressed that there is a fundamental difference between the revocation of mental health patient's conditional release and that of a convict's parole or probation.

---

**3.** The patient also challenged the statute and his rehospitalization as violating equal protection. As to this claim, the court ruled that "the legislature could [have] reasonably [concluded] that where the trial visit lasts for over one-half

. . . the maximum duration of the involuntary commitment, the . . . [patient] has been at liberty for long enough a time that an additional hearing would be desirable." *Dietrich, supra,* 558 P.2d at 361.

"[T]his case is fundamentally different from those involving revocation of probation or parole. In the latter, revocation is based on a finding that there has been a willful and knowing violation of a condition or conditions imposed upon one previously convicted of having violated the criminal law. These people, at least presumably, are sane and their acts are the result of their own volition. They are not persons suffering from a condition or disease which requires continuing medical treatment.

In the case of mental patients, even more than in the case of patients suffering from physical ailments, a decision as to whether to keep the patient in the hospital or to discharge him must remain a medical one, to be decided by medical experts, based upon the mental condition of the patient and the necessity for hospital treatment, as determined by them." Id. at 861–62.

Moreover, the court stressed that a summary revocation of a mental health patient's conditional release is a medical determination rather than a factual or adversarial decision. Id. at 861. The status being one of continuing treatment, the dictates of due process are not germane to a mental health patient who has been previously and lawfully committed to hospitalization in the first instance.

A synthesis of the above cases leads us to conclude that the better view is the one reflected in the holdings of Meisel and Lewis and buttressed by the holdings in the analogous cases of Ball and Bye : A mental health patient committed to the custody of the Department of Health and Welfare who is conditionally released from hospitalization has a liberty interest in that status which cannot be terminated without due process of law.[4] Nevertheless, the court is mindful that the analogy utilized in the cases between the liberty interest involved

in the conditional release of a mental health patient and the liberty interest involved in the parole of a convicted criminal cannot be drawn too tightly. See discussion infra at 900–903.

Pursuant to the provisions of I.C. § 66–338(a), a mental health patient in the custody of the Department of Health and Welfare, whose condition has improved, may be conditionally released from hospitalization provided he receives outpatient treatment and/or abides by other specified conditions. As noted earlier, inherent in a decision to conditionally release a mental health patient from hospitalization is a determination that he no longer poses a danger to himself or to others, and is able to function outside the hospital without major social services support. One court has characterized the conditional release of mental health patients as follows:

"The clinical program prescribed will of course vary in nature and degree with the type of mental illness with which the individual is afflicted. The conditions imposed upon the outpatient may simply involve the taking of certain prescribed medications, or, in addition, extensive counselling, therapy, and observation at the local mental health clinic might be required. As long as the outpatient complies with the regimen meted out through his supervisor and suffers no deterioration in his condition, his conditional liberty will not be revoked." In Re Anderson, 73 Cal.3d 98, 140 Cal.Rptr. 546, 550 (1977).

Similarly, it has been noted that under conditional release programs "the patient is generally free to regulate his own life, just as if he had been discharged from the hospital." Call, "Constitutional Law: The Summary Revocation of an Involuntary Mental Patient's Convalescent Leave—Is it Unconstitutional?" 33 Okla.L.Rev. 366, 370 (1980). Under this paradigm, although the conditional released mental health patient's

---

4. It is to be noted that the Dietrich case is not in direct opposition to the conclusion arrived at today. A significant fact taken into account in Dietrich is that under the Oregon statutory scheme, a mental health patient is foreclosed from a revocation hearing only when the pa-

tient's conditional release is revoked less than ninety days after it began. Ore.Rev.Stat. § 426.290(4) (1975). Otherwise, the patient has a statutory right to an administrative hearing, including the right to counsel, within seven days after rehospitalization.

liberty interest is indeterminate, he is nevertheless free to form "[the] enduring attachments of normal life," and enjoy "many of the core values of unqualified liberty." *Morrissey v. Brewer, supra,* 408 U.S. at 482, 92 S.Ct. at 2600, 33 L.Ed.2d at 495. Thus viewed, the revocation of a mental health patient's conditional release status and order of rehospitalization constitutes a "massive curtailment of liberty" (*Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 [1972] )—a deprivation which can only be accomplished by the State in accordance with due process of law. *Lewis v. Donahue, supra*; *Meisel v. Kremens, supra.*

Whether one calls the revocation of a mental health patient's conditional release status as a "medical" as opposed to a "factual" or "adversarial" decision, or label the status a "continuing cause of treatment" does not address the dispositive question, and as the court in the case of *In Re Anderson, supra,* 140 Cal.Rptr. at 551 (1977), observed "is simply a variation of the now discredited right-privilege distinction." We are therefore of the opinion that the reasoning of the *Hooks* decision is unpersuasive in this regard, and note that the concerns of the court in *Hooks* more appropriately go to the question of the balancing of the relative interests of the state and the individual in view of the purpose and function of involuntary returns of mental health patients from a conditional release.

Before turning to the question of what process is due a mental health patient whose conditional release status is subject to revocation, we turn our attention to the Department of Health and Welfare's contention that the post-rehospitalization judicial review procedure contained in I.C. § 66–340 (1974) as well as the provision for habeas corpus review contained in I.C. § 66–347 withstand constitutional scrutiny. These two statutory provisions read respectively as follows:

"66–340. Appeal from order of rehospitalization.—At any time within thirty (30) days after the director of the department of health and welfare or his designee orders a patient rehospitalized in ac-

cordance with the provisions of sections 66–338 or 66–339, Idaho Code, an appeal may be taken therefrom by any person aggrieved thereby to the district court of the county in which such facility is located, and such court shall have the power and jurisdiction to hear and determine said appeal, and to affirm or modify such order, or to order such patient to be involuntarily rehospitalized to the facility or other place of detention from which he was conditionally released."

"66–347. Writ of habeas corpus.—Any individual detained pursuant to this act shall be entitled to the writ of habeas corpus upon proper petition by himself or a friend to any court generally empowered to issue the writ of habeas corpus in the county in which he is detained."

■ Both statutory provisions enable a mental health patient to seek an after the fact determination of the propriety of an order of rehospitalization. The United States Supreme Court has recognized that provisions for subsequent judicial inquiry into the propriety of governmental deprivations of liberty or property interests will withstand constitutional scrutiny in limited circumstances, *i.e.,* the opportunity for ultimate judicial determination must adequately protect the interests of the individual affected by the summary action and there must be an overriding state interest in postponing inquiry. *See Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Mathews v. Eldridge, supra; Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). In the instant case, however, it cannot be said that either I.C. § 66–340 (1974) or I.C. § 66–347 adequately protect the interests of a mental health patient whose conditional release status has been revoked. Review under either provision is not mandatory. Neither provision requires that the patient be apprised of the reasons for his rehospitalization. Under these circumstances, there can be no assurances of meaningful review. But more importantly, both provisions are infirm because they place the bur-

den on the patient to bring forth sufficient facts to justify relief from an order of rehospitalization. It is the state, in cases where it seeks to deprive an individual of a protectible liberty or property interest, which must bring forth sufficient facts justifying its summary action. *See Doe v. Gallinot*, 486 F.Supp. 983 (C.D.Cal.1979); *Fhagen v. Miller*, 306 F.Supp. 634 (S.D.N.Y. 1969); *In re Anderson, supra.*

### III

As noted earlier in this opinion, the Supreme Court in *Morrissey v. Brewer* stated that different forms of deprivation of liberty require different forms of due process protection. To reiterate:

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands. '[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). To say that the concept of due process is flexible does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure." 408 U.S. at 481, 92 S.Ct. at 2600, 33 L.Ed.2d at 494.

Thus, the question in this case is not whether the same procedures as provided for in cases of parole revocation as enunciated in *Morrissey* are required in cases involving rehospitalization of a conditionally released mental health patient; but rather, the question is whether such procedures are appropriate.

In this context, the court is mindful of the following statement of the Oregon Court of Appeals in the case of *Dietrich v. Brooks, supra* :

"Termination of a trial visit [conditional release] is not an isolated event. If it were, then a denial of liberty based upon the sworn statements of two people and the judgment of an admitting physician, standing alone, would be unconstitutional for lack of due process. Rather, it is one of a sequence of events within a course of confinement and treatment. It is the procedural protection which surrounds that course of confinement and treatment which must be measured against the Due Process Clause to determine if it is appropriate to the public purpose to be served and to the nature of the individual loss to be guarded against." 558 P.2d at 361. *Accord, In re Bye, supra.*

Within this framework, the *Meisel* decision, and the analogous decision in *Ball*, are unpersuasive as to what process is due a conditionally released mental health patient upon rehospitalization. In both cases the courts applied the dictates of *Morrissey in toto* without any analysis of the governmental interest involved in summary revocation of the conditional releases of the mental health patient and narcotic addicts respectively, and its impact upon the private interests of the individuals so affected. Additionally, it is to be noted that in *Lewis*, the other federal district court case dealing specifically with the summary revocation of a mental health patient's conditional release, the court declined to enter into a discussion of what process was due the patient.

In the instant situation, the conditionally released mental health patient's interest in insuring that the revocation of his right to remain at liberty be based on an accurate evaluation of the facts and diagnosis must be balanced against the Department's need to conduct its program of treatment of the mentally ill and mentally retarded with a minimum of judicially imposed interference. The court is of the opinion that although mental health patients are entitled to due process when the Department seeks to revoke their conditional release status, important differences between the conditional release program for

mental health patients and the parole system are such that the procedures outlined in *Morrissey* for parole revocation, both in terms of timing and formality, are inappropriate in the instant case.

The United States Supreme Court has recently recognized on three different occasions that there are significant differences between the criminal setting and the civil commitment setting that necessitate differing due process considerations. In *Addington v. Texas*, 441 U.S. 418, 432–433, 99 S.Ct. 1804, 1812–1813, 60 L.Ed.2d 323, 334–335 (1979), the court held that due process required that a "clear and convincing" standard of proof be used in involuntary civil commitment proceedings. In so holding, the court rejected the argument that the criminal standard of proof, *i.e.*, "beyond a reasonable doubt," be applied. Chief Justice Burger, writing for a unanimous court, stated emphatically that "a civil commitment proceeding can in no sense be equated to a criminal prosecution." 441 U.S. at 428, 99 S.Ct. at 1810, 60 L.Ed.2d at 332. Three important distinctions between the civil commitment setting and the criminal setting were noted in support of this conclusion. First, the state's power is exercised in a different manner in the two settings. In civil commitment proceedings the state's power is exercised with the purpose of providing care designed to treat the individual, whereas, in the case of criminal convictions, the state's power is exercised punitively. *Id.* Second, the risk of error in commitment proceedings is less than the risk associated with criminal proceedings. The court reasoned that because of the continuing administrative review afforded a mental health patient relative to his condition the risk of an erroneous civil commitment is less than an erroneous criminal conviction. 441 U.S. at 428–429, 99 S.Ct. at 1810–1811, 60 L.Ed.2d at 332–333. Finally, and probably most important, the court noted that the inquiry in the two settings is divergent. Criminal proceedings address themselves to specific, ascertainable facts while commitment proceedings require interpretations as to diagnosis and predictions of future behavior based on imprecise factors. 441 U.S.

at 429, 99 S.Ct. at 1811, 60 L.Ed.2d at 333. Similarly, in *Parham v. J. R.*, 442 U.S. 584, 616–617, 99 S.Ct. 2493, 2511, 61 L.Ed.2d 101, 127 (1979), the court held that when parents seek to have their child committed, or the state attempts to commit a ward of the state in voluntary commitment proceedings, fewer procedural protections are required than in juvenile delinquency proceedings. In so holding, the court again explained that commitment proceedings are different in kind from other proceedings:

"Although we acknowledge the fallibility of medical and psychiatric diagnosis, see *O'Connor v. Donaldson*, 422 U.S. 563, 584 [95 S.Ct. 2486, 2498, 45 L.Ed.2d 396] (1975) (concurring opinion), we do not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge or administrative hearing officer after a judicial-type hearing. Even after a hearing, the nonspecialist decisionmaker must make a medical-psychiatric decision. Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real." 442 U.S. at 609, 99 S.Ct. at 2507, 61 L.Ed.2d at 123.

Finally, the case of *Vitek v. Jones*, 445 U.S. 480, 495, 100 S.Ct. 1254, 1264–1265, 63 L.Ed.2d 552, 566 (1980), is to be noted. In that case the court held that certain procedural safeguards must be satisfied before a prisoner may be transferred to a mental institution. The case is noteworthy because of Justice Powell's concurrence in part, which was necessary to obtain a majority. Based upon the recognition that "the issues of civil commitment 'are essentially medical in nature,'" Justice Powell opined that "due process merely requires that the State provide an inmate with qualified and independent assistance. Such assistance may be provided by a licensed psychiatrist or other

mental health professional." 445 U.S. at 500, 100 S.Ct. at 1267, 63 L.Ed.2d at 569.[5]

■ Although the United States Supreme Court has not addressed the due process implications of the revocation of a mental health patient's conditional release, it is apparent from the foregoing cases that reliance upon the criminal analogy is suspect in determining what process is due such an individual. This is particularly true under the interpretation of I.C. § 66–339 advanced today. See discussion, supra, at 3. It is to be recalled that a decision to revoke a mental health patient's conditional release status and to rehospitalize the patient must be accompanied by a determination that the conditions warranting hospitalization in the first instance are again present. The governmental interest therefore involved when a decision is made to rehospitalize a mental health patient on conditional release status is of significant magnitude: the protection of society from the patient and/or the protection of the patient from himself. Thus viewed, timing becomes more critical in the instant case than it is in the parole setting. In the parole situation a delay in the revocation of an individual's parolee status, while highly undesirable in cases where revocation is found to be justified, does not present a serious threat to the degree of rehabilitation achieved prior to the violation. In contrast, in cases where a mental health patient is suspected of remission, the Department's interest in rehospitalization for immediate treatment is paramount, as the progress towards recovery which had been achieved is seriously jeopardized by a remission which is left untreated. As to this point of analysis, the following description of the functional nature of outpatient treatment of mental health patients from the case of In re Anderson, supra, is persuasive.

"Community treatment of a mental patient facilitates the patient's adjustment to community life and in many cases speeds restoration of his sanity as well as affording state institutional personnel the opportunity to make an informed decision as to the patient's suitability for absolute discharge. [Citations omitted.] Yet in some cases the patient may not be ready for such conditional release, may fail to adjust to community life, or may suffer a relapse in his mental condition unrelated to the rigors of community life. In each instance, there is a reasonable probability that the patient's condition may deteriorate, or that he may endanger the safety of others if he remains on outpatient status. [Citation omitted.] ... [T]he need for immediate recommitment is of paramount importance both for public and patient well-being, and the decision is peculiarly a medical one best made by a person well versed in the patient's case history." 140 Cal.Rptr. at 552.

■ Additionally, decisions to rehospitalize a mental health patient on conditional release are peculiarly medical in nature and as such are less subject to objective inquiry than a revocation decision in the parole system. See, e.g., In re Bye, supra; In re Anderson, supra. Accord, Glasco v. Brassard, 94 Idaho 162, 483 P.2d 924 (1971). Accordingly, some deference must be given to the decision of the Director of the Department or his designated representatives, professionals who work in the mental health field on a day to day basis, that revocation of a mental health patient's conditional release is justified for purposes of immediate treatment.

■ The great weight we accord the Department's need for immediate rehospitalization of a conditionally released mental health patient suspected of remission is such that the general rule that an individual be given an opportunity for a hearing before he is deprived of a protectible interest is inapplicable. The situation present when a decision is made to revoke the conditional release status of the patient is extraordinary: the patient because of a suspected remission in his mental condition possibly poses a danger to others and/or to himself.

■ Nonetheless, it would be wrong, and in certain instances tragic, to assume

5. The plurality, however, was of the view that due process requires that the State provide an inmate with legal counsel. 445 U.S. at 500, 100 S.Ct. at 1267, 63 L.Ed.2d at 569.

that all evaluations and reports that a conditionally released patient is in need of rehospitalization are accurate. In order to militate against the possibility of an erroneous decision that rehospitalization is warranted, the court is also of the opinion that a mental health patient whose conditional release status is subject to revocation is entitled to mandatory notice and a hearing to follow as soon as is reasonably possible after the patient's return to the hospital.

Specifically, the minimal due process requirements are: (1) prompt written notice to the patient of the reasons for and evidence relied on justifying rehospitalization as well as notice of the right to challenge the allegations and (2) a hearing before a neutral hearing body to be held as soon as is reasonably possible following the patient's rehospitalization, at which time the patient is to be afforded the right to counsel, the right to present evidence and examine witnesses, and upon a decision sustaining the order of rehospitalization, the right to a written statement by the fact-finding body as to the reasons for revocation of the patient's conditional release status. We stress that these are minimal requirements.

The record before the court is void of detailed information as to what transpired at the time the appellant was summarily returned to State Hospital South for rehospitalization on August 22, 1974. However, on the face of the petition for a writ of habeas corpus appellant has sufficiently stated grounds for its issuance to examine into whether her constitutionally protected rights were breached. *See, e.g., Cole v. Cole,* 68 Idaho 561, 201 P.2d 98 (1948). Accordingly, the order quashing the writ of habeas corpus is reversed and the cause remanded for further proceedings in accordance with the views expressed in this opinion.[6]

Costs to appellant.

BISTLINE and DONALDSON, JJ., concur.

BISTLINE, Justice, concurring specially.

[6] In view of the long lapse of time that has transpired since the appellant's rehospitalization, at a subsequent hearing the district court could consider whether the director of the Department or his designated representative have

## I.

I agree with the majority that conditionally released mental patients have a liberty interest which is entitled to protection under the due process clause of the United States Constitution. "Involuntary confinement for treatment of mental illness is a 'massive curtailment of liberty.'" *C. R. v. Adams,* 649 F.2d 625, 627 (8th Cir. 1981). I also agree that the protections which the majority sets forth are a part of the process which is constitutionally required prior to deprivation of that liberty interest. I am concerned, however, that the majority has failed to specify several additional procedural safeguards which are, to my mind, also necessary to meet the minimum requirements of the due process clause. When the state sanctions the restriction of a liberty interest, such a restriction should intrude upon that interest to the smallest degree necessary for the purposes of the restriction. *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). The restrictions in this case go far beyond those necessary to achieve the medical and societal goals of the statutes governing the involuntary treatment of mental patients.

## II.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976), held that, in considering what process is due, courts should take into account:

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved

followed their continuing obligation under I.C. § 66–337 to examine the appellant at least every 120 days to determine if the conditions justifying hospitalization still exist.

and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."

The private interest involved in an involuntary recommitment is of the first order—an individual's liberty—and the harm which would result from an erroneous determination is correspondingly great. Diagnosis of mental disorders, and recognition of disorder symptoms, is at best imprecise, and there is therefore a great risk that an erroneous deprivation of liberty will in fact occur. With these two factors weighing heavily in favor of extensive procedural safeguards, I turn to the majority's analysis regarding the interests of the state and the need for protection of the individual and of society.

Under the majority's analysis, the determination of the degree of danger posed to the public and the immediacy of the risk to the patient is to be made by the director of the department of health and welfare or his designated representative, and the patient actually rehospitalized, *prior* to a hearing.[1] This is clearly contrary to one of the basic precepts of procedural due process—that the process which stands between the state and the threatened individual must be completed *prior to* ultimately depriving the individual of the protected interest. If the state elects to hold only a post-deprivation hearing, a heavy burden is upon it to show that circumstances did not allow a pre-deprivation hearing.

It is an absolutely fundamental precept of the due process clause of the United States Constitution that, if possible, the proper procedures be accorded *prior to* deprivation of the protected interest.

"That the hearing required by due process is subject to waiver, and is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Boddie v. Connecticut,* 401 U.S. 371, 378–79, 91 S.Ct. 780, 786–87, 28 L.Ed.2d 113 (1971) (footnotes omitted) (emphasis original). *See Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Muscare v. Quinn,* 520 F.2d 1212, 1215 (7th Cir. 1975); *Wilderman v. Nelson,* 467 F.2d 1173 (8th Cir. 1972).

"The fundamental mandate of the Fourteenth Amendment is that a person be afforded notice and an opportunity to be heard *prior* to deprivation of a significant liberty or property interest. (See *Laing v. United States,* 423 U.S. 161, 186, 96 S.Ct. 473 [486], 46 L.Ed.2d 416 (Brennan, J., concurring).) A narrow exception to this requirement has been fashioned as to property interests (*Fuentes v. Shevin,* 407 U.S. 67, 90–92, 92 S.Ct. 1983, 1999–2000, 32 L.Ed.2d 556) such that, in limited instances, 'where *only property rights* are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate' .... Given the 'transcending value' of a person's interest in liberty ..., however, the prior hearing requirement cannot so readily be subverted with respect to liberty interests. As habeas corpus relief is an after the fact determination of the propriety of confinement, it cannot by any stretch of the imagination operate as a constitutional substitute for a prior (prerevocation) hearing. ... It is the state, in seeking deprivation of respondent's conditional liberty, which must reliably establish

---

1. I am concerned by the "as soon as reasonably possible" time limit set by the majority for post-deprivation hearing. This leaves tremendous discretion as to timing in the hands of the institution. I would require that the hearing be held within 48 hours of the time that the person is taken into custody, unless the patient requests additional time to conduct discovery and prepare his or her case. *See* I.C. § 66–339 (may not detain conditionally released patient outside of institute for more than 48 hours); I.C. § 66–329A (person may be taken into custody as emergency patient without court order only if evidence supporting seizure is presented to court within 24 hours).

facts justifying its proposed action. ...
Moreover, review by way of a petition for
habeas corpus is not mandatory ... and
under the statutory language the pa-
tient's petition will be denied if he is
unable to marshal 'facts sufficient to jus-
tify relief.' Without being apprised of
the reasons behind his recommitment, the
patient can hardly be assured of the
meaningful review to which he is consti-
tutionally entitled." *In Re Anderson*, 73
Cal.3d 98, 140 Cal.Rptr. 546, 551–52 (1977)
(citations omitted).

The majority's rule favors post-depriva-
tion hearings by placing discretion in the
hands of the director or his designated rep-
resentative to recommit a patient without a
hearing based solely upon the reports of
totally untrained lay-people. The majori-
ty's analysis assumes that most reported
relapses are either accurately diagnosed or
involve immediate danger to the public or
the patient. No factual basis for this as-
sumption appears in the record. In fact,
literature on the subject suggests that the
opposite is true. For example, a recent law
review article, after an exhaustive review
of available literature, concludes:

"(a) there is no evidence warranting the
assumption that psychiatrists can accu-
rately determine who is 'dangerous'; (b)
there is little or no evidence that psychia-
trists are more 'expert' in making the
predictions relevant to civil commitment
than laymen; (c) 'expert' judgments
made by psychiatrists are not sufficiently
reliable and valid to justify nonjudicial
hospitalization based on such judgments;
(d) the constitutional rights of individuals
are seriously prejudiced by the admissibil-
ity of psychiatric terminology, diagnoses,
and predictions, especially those of 'dan-
gerous' behavior; and therefore (e) courts

should limit testimony by psychiatrists to
descriptive statements and should exclude
psychiatric diagnoses, judgments, and
predictions." Ennis & Litwack, *Psychia-
try and the Presumption of Expertise:
Flipping Coins in the Courtroom*, 62 Cal.
L.Rev. 693, 696 (1974).

It would be wrong, and in many cases
tragic, to assume that all reports of "relaps-
es" are either accurate or necessarily justify
immediate rehospitalization. As the court
noted in *C. R. v. Adams, supra*, "[i]f the
patient is refusing treatment, *which usually
means missing appointments*, the treating
psychologist informs the mental health ref-
eree, who has the authority to issue an
order for the patient's return to the hospi-
tal." 649 F.2d at 629 (emphasis added).
The fact that a patient misses an appoint-
ment during out-patient treatment does not
necessarily indicate a danger to the commu-
nity or to the individual. On the other
hand, the harm suffered by unnecessary
reinstitutionalization cannot be cured by a
post-deprivation hearing.[2] The possibility
of simple error in the factual basis for a
reported relapse gives rise to the spectre of
the conditionally released patient being
plucked by the state from his or her home
or place of work, with no prior notice, and
returned to an institution, even in those
instances in which the patient has indeed in
all respects followed the conditions of the
release program. This cannot be tolerated.

Ennis & Litwack conclude that "psychiat-
ric judgments are not only unreliable with
respect to the ultimate diagnoses, but lack
consistency even in the perception of the
presence, nature, and severity of *symp-
toms*." 62 Cal.L.Rev. at 706 (emphasis add-
ed). The Supreme Court has recognized
that the very nature of the medical, as

**2.** For a fictionalized but thought-provoking
account of the harm that may befall those com-
mitted to a mental institution, and particularly
*those who do not belong there, see* K. Kesey,
*One Flew Over the Cuckoo's Nest*. As the
Supreme Court stated in *Vitek v. Jones*, 445
U.S. 480, 100 S.Ct. 1254, 1265, 63 L.Ed.2d 552
(1980):

"Because prisoners facing involuntary trans-
fer to a mental hospital are threatened with

immediate deprivation of liberty interests
they are currently enjoying *and because of
the inherent risk of a mistaken transfer*, the
District Court properly determined that pro-
cedures similar to those required by the court
in *Morrissey v. Brewer, supra*, were appro-
priate in the circumstances present here."
(Emphasis added.)

opposed to factual, determination that a person must be committed, requires procedural safeguards.

"We recognize that the inquiry involved in determining whether or not to transfer an inmate to a mental hospital for treatment involves a question that is essentially medical. The question whether an individual is mentally ill and cannot be treated in prison 'turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists.' *Addington v. Texas*, 441 U.S., at 429, 99 S.Ct., at 1811. The medical nature of the inquiry, however, does not justify dispensing with due process requirements. It is precisely 'the subtleties and nuances of psychiatric diagnoses' that justify the requirement of adversary hearings. *Addington v. Texas*, 441 U.S., at 430, 99 S.Ct., at 1811." *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 1265, 63 L.Ed.2d 552 (1980).

A 1969 study concluded that:

"[P]sychiatrists are rather inaccurate predictors—inaccurate in an absolute sense—and even less accurate when compared with other professionals, such as psychologists, social workers and correctional officials and when compared to actuarial devices, such as prediction or experience tables. Even more significant for legal purposes, it seems that psychiatrists are particularly prone to one type of error—overprediction. They tend to predict antisocial conduct in many instances where it would not, in fact, occur. Indeed, our research suggests that for every correct psychiatric prediction of violence, there are numerous erroneous predictions. That is, among every group of inmates presently confined on the basis of psychiatric predictions of violence, there are only a few who would, and many more who would not, actually engage in such conduct if released." Dershowitz, The

Psychiatrist's Power in Civil Commitment: A Knife That Cuts Both Ways, *Psychology Today*, Feb. 1969 at 47.

In 1966 the Supreme Court held, in *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), that felons detained in department of corrections mental hospitals after their prison terms had expired must be released or civilly committed. A study of 969 patients in New York State who were affected by the decision found that one year after the patients were transferred to civil hospitals, 147 were discharged to the community and 702 were found to present no special problem to the hospital staff. Only seven were so dangerous as to require recommitment to a prison hospital. *See* Hunt & Wiley, Operation Baxstrom After One Year, 124 Am.J.Psychiat. 974 (1968). Another study found that a team of five mental health professionals was able to accurately predict dangerousness only one third of the time in advising whether patients should be released. This means that *two thirds* of the patients which this team recommended not be released because of dangerousness, but who were nevertheless released, were *not* in fact dangerous. *See* Kozol, Boucher & Garofalo, The Diagnosis and Treatment of Dangerousness, 18 Crime & Delinquency 371 (1972).

If professionally trained people, in a clinical setting, cannot agree among themselves as to the problems of mental patients, the risk of unnecessarily depriving conditionally released patients of their liberty based upon the unprofessional[3] observations of untrained observors in a non-clinical setting is extremely high. Particularly pertinent to the choice between a pre-deprivation, in-community hearing and a post-deprivation hearing in an institutional setting is the fact that "psychiatric judgments are strongly influenced by the context of the examination . . . . Prospective patients are likely to respond quite differently to the

---

**3.** I.C. § 66–339 allows a recommitment order to issue upon reports from "any two (2) persons who are either licensed physicians, health officers, designated examiners or peace officers, the prosecuting attorney or a judge of a court . . . ." The majority retains the aspect of the statute, even where no prior hearing is allowed. There is *no* requirement that any of the persons allowed to report be trained in detecting or diagnosing "relapses" or mental problems in general.

question if they are permitted to answer them in the familiarity of their own homes, rather than in a strange and possibly frightening hospital environment." Ennis & Litwack, *supra*, 62 Cal.L.Rev. at 748.

It is alarming to see the rather casual attitude of the other members of this Court towards distinction between a pre-deprivation hearing and a post-deprivation hearing. *See, e.g., Simmons v. Board of Trustees*, 102 Idaho 552, 633 P.2d 1130 (1981). The majority's statement that "the ... need for immediate rehospitalization of a conditionally released mental health patient suspected of remission is such that the general rule that an individual be given a hearing before he is deprived of a protectible interest is inapplicable" improperly places the burden upon the person being deprived of their liberty to show why a pre-deprivation hearing is required under the facts of the particular case. As I have attempted to demonstrate, the need for most hearings to be held only *following* recommitment is extremely small, the degree of curtailment of liberty and possible harm to the detainee is great, and the possibility of an erroneous diagnosis, leading to a loss of civil liberty, is greater in a clinical setting. The majority's statement that "[t]he situation present when a decision is made to revoke the conditional release status of the patient is extraordinary: the patient because of a suspected remission in his mental condition possibly poses a danger to others and/or to himself" is pure speculation. The *reason* for a hearing in the first instance is to determine whether the facts which the department asserts are in fact true. A rule allowing prehearing determinations by individuals acting on behalf of the state to provide the only safeguard against erroneously taking a person into custody cannot suffice to protect the civil liberties of the people affected—if it could, prior hearings would simply not be a part of due process. As I explain *post* at note 6, an emergency situation may very well justify a prehearing deprivation. Short of that, however, the scales must be tipped in favor of a pre-deprivation hearing. In this regard, it need only be noted that *original* commitment

hearings, which require showings of need for commitment which are *identical* to those required for recommitment must, under I.C. § 66–329 and the Idaho and United States constitutions, be *preceded* by a hearing. Unless the majority is willing to take the position that original commitment proceedings need not be preceded by a hearing, so long as a designated individual makes certain factual findings, then its concern for the public and the health of the patient rings hollow.

The factual determination of whether a parole violation has occurred will ordinarily be much less complex than the determination of whether a conditionally released patient has suffered a relapse requiring recommitment. Consequently, the possibility of error in recommitting a patient is higher, and the majority simply draws the wrong conclusions from its comparison with parole revocation proceedings. While the majority's requirement of a hearing is much closer to the requirements of the due process clause than the procedures mandated by I.C. § 66–339 (1974), it still falls short of meeting the minimum necessary to insulate individuals from abuses of state power.

In this regard, the evils of I.C. § 66–339 (1974) are apparent. I.C. § 66–339 provided at the time of True's rehospitalization:

"Rehospitalization required of patient conditionally released from state hospital. —In the event it is reported to the director of the department of health and welfare or his designated representative by any two (2) persons who are either licensed physicians, health officers, designated examiners or peace officers, the prosecuting attorney or a judge of a court, that any patient who is under commitment to the custody of the director of the department of health and welfare and who has been conditionally released from a facility, *has relapsed* and is again *in need of hospitalization*, the director of the department of health and welfare or his designee may order said patient to be rehospitalized or otherwise detained immediately. Such order, made in writing *or by telephone*, until it can be put in

writing and indorsed [sic] by a judge of any court of competent jurisdiction of the county in which said patient is then residing; shall authorize any peace officer or health officer to take the patient into protective custody and transport him back to the hospital or other place of detention, or restrain him until the director can send transportation for him, which detention or restraint may not exceed a period of forty-eight (48) hours unless said detention is in a facility." (Emphasis added.)

Even if one were to assume that "relapse" and "in need of hospitalization" were terms which automatically demonstrated a danger to the public sufficient to justify an immediate loss of liberty without a prior hearing,[4] one must still inquire into the nature of the "report" which, under the statute, is not required to be in writing, and empowers the director to issue an *ex parte*, verbal order to recommit the patient.

To my mind, in order to satisfy the due process clause, the "report" upon which a director's order may issue (1) must be either in writing or recorded, so that the person subject to the order may review, understand, and rebut the information upon which the order is based, and (2) must set forth the reasons justifying immediate detention and/or reinstitutionalization. Affidavits are ordinarily required in other situations in which ex parte orders are allowed, *see e.g.*, I.R.C.P. 6(c)(2); *Dietrich v. Brooks*, 27 Or.App. 821, 558 P.2d 357, 359 (1976) (written complaint statutorily required prior to termination of trial visit status), and they should certainly be required when an individual's liberty is so drastically affected. Additionally, I would hold that, except in emergency situations, the director's order itself must be in writing so that it may be reviewed and rebutted.

I am also concerned that some patients might be unable or unwilling to take advantage of the procedural safeguards which due process requires, due to either a lack of understanding of their rights or institutional barriers to exercising those rights. Under I.C. §§ 66–340 and –347, recommitted patients may challenge their recommitment by way of either an appeal to district court from the order of recommitment or a writ of habeas corpus. Both proceedings must be in district court, yet no provisions are made for the assistance of counsel. The majority correctly holds that the right to counsel attaches at the (presumably) administrative hearing on a patient's recommitment order. I would also hold that the provisions for counsel set forth in I.C. § 66–329(e) (1974)[5] as to the original commitment proceedings are required by due

---

4. Although the majority reads the factual predicate necessary for original commitment into I.C. § 66–339 (1974), a reading with which I agree, this does not obviate the need for, or the feasibility of, a prior hearing. *See* I.C. § 66–329 (original commitment proceedings must include prior hearing).

5. I.C. § 66–329(e) (1974) provided:

"An opportunity to be represented by counsel shall be afforded to *every* proposed patient, and if neither he nor others provide counsel, the court shall appoint a counsel at the time the application is received by the court and authorize a proper fee to be paid such counsel from the county funds. The court may order the department of health and welfare in the county wherein the proposed patient resides to make an investigation of the ability of said proposed patient and his relatives legally liable as specified in section 66–354, Idaho Code, to pay for said counsel, and to forward a report of the findings to the court. If the findings so warrant, the court may order the prosecuting attorney or other proper official to initiate suit in the name of the county to collect any fees paid by the county for said proposed patient's counsel."

I.C. § 66–329(g) now provides that "[a]n opportunity to be represented by counsel shall be afforded to every proposed patient, and if neither the proposed patient nor others provide counsel, the court shall appoint counsel in accordance with chapter 8, title 19, Idaho Code ...." I.C. § 19–852(b)(1) requires that the state provide counsel for needy persons "at all stages of the matter beginning with the earliest time when a person providing his own counsel would be entitled to be represented by an attorney *and including revocation of probation.*" (Emphasis added.) Certainly the loss of liberty involved in recommitment to a mental institution is no less than that lost through revocation of probation. In some instances the deprivation is substantially greater. *See, e.g., Kesey, supra* note 2.

process to be extended to recommitted patients who wish to challenge the validity of their order of recommitment under I.C. §§ 66–340 and –347 or who wish to challenge the reports of persons seeking recommitment before recommitment has actually been ordered. The need for and right to such counsel is present regardless of whether there is a hearing prior to or immediately after deprivation of the patient's liberty. Thus, when a patient is detained outside a "facility" under I.C. § 66–339, the legal assistance should be made available forthwith and certainly within 48 hours, to insure that such patient is not detained longer than the maximum amount of time allowed by the statute.

I.C. § 66–329(d) (1974) provided:

"Upon receipt of such application and designated examiners' reports the court shall appoint a time and place for hearing which may be held immediately but in any event such hearing must be held not more than five (5) days from the receipt of such designated examiners' reports and thereupon give *written notice* of such time and place of such hearing *to the petitioner, to the proposed patient, to his legal guardian,* if any, *or to his spouse, parents, or nearest known other relative, if any, or friend.*" (Emphasis added.)

This notice is required by due process in recommitment proceedings as well, to insure that if the mental condition or physical capabilities of the patient are such that he or she cannot understand or exercise the right to contest recommitment, someone who *can* understand that right and, if necessary, exercise it, has notice of the attempt to recommit.

To summarize, I would hold that the due process clauses of the United States and Idaho constitutions require that conditionally released mental patients, except in emergency situations,[6] receive the following procedural safeguards prior to reinstitutionalization: (1) written notice to the patient and at least one other person as set forth in I.C. § 66–329(d); (2) an in-community hearing to determine whether recommitment is necessary—before either a neutral hearings examiner with a background in mental health or a district judge; (3) an opportunity at the hearing to present evidence and testimony and to cross-examine witnesses against the patient; and (4) legal counsel, at the state's expense if the patient is indigent.

This Court has not previously waivered in its protection of liberty interests from unwarranted and arbitrary intrusions by the state. *See State v. Wolfe,* 99 Idaho 382, 582 P.2d 728 (1978). The Court should more fully respond to the obligation to protect the liberty of *all* citizens of our state, and particularly the disadvantaged, by insuring that the state only restrict such liberty when it is necessary to do so, and never otherwise.

BAKES, Chief Justice, dissenting:

While it may be that the appellant was entitled to some form of hearing to determine if her mental condition was such that she should have been rehospitalized, any failure by the state to hold such a hearing has long since ceased to provide a basis for releasing the appellant. I.C. § 66–337 provided the following during the relevant period of this proceeding:

"The director of the department of health and welfare or his designated representative shall as frequently as practical but at least once at the end of the first ninety (90) days examine or cause to be examined every patient, and if it is determined that the conditions justifying involuntary care and treatment no longer exist, discharge the patient . . . . If the conditions justifying involuntary care still exist a similar review shall be held every one hundred twenty (120) days . . . ."

---

**6.** By "emergency situations," I mean those situations in which there is an immediate and patently evident risk of harm to the patient and/or the public. While such a situation would in most instances justify an arrest, and thereby moot the question of whether a prior hearing is required, a procedure for immediately placing such a patently dangerous patient in the hands of those qualified to attend to the patient's mental/physical problems is certainly preferable to placing such a person in a county jail.

Appellant waited in excess of four years to apply for a writ of habeas corpus. During that period of time, I.C. § 66–337 required that the appellant be examined and determined to be in need of involuntary care and treatment no less than sixteen times. The United States Supreme Court held in *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), that involuntary commitment to a mental institution may not constitutionally continue after the basis for confinement no longer exists. I.C. § 66–337, in recognition of that rule, places the burden on the director of health and welfare to justify detention by regular examination of the patient. The patient must be discharged if it is determined that "the conditions justifying involuntary care and treatment no longer exist." Consequently, even though the appellant may have been denied appropriate proceedings to determine her mental status at the time of rehospitalization, that deficiency has long since been cured by the mandatory provisions of I.C. § 66–337. Her commitment is not unjustified, but rather has been justified through the safeguard of I.C. § 66–337.

The majority states in its opinion, *ante* at 900, that the provisions for appeal of an order of rehospitalization under I.C. § 66–340 (and presumably the provisions of I.C. § 66–343 providing for a patient's personal right to petition for release), do not adequately protect the interests of the patient because review is not mandatory, and because the burden is placed on the patient to justify release. I.C. § 66–337, however, provides for frequent mandatory review and requires that the department justify the continued commitment of the patient. Any insufficiency in the initial determination that the appellant required rehospitalization has therefore long since been cured. The district court's quashing of the writ of habeas corpus was thus proper, even though premised on a possibly incorrect theory. If the appellant thinks that the I.C. § 66–337 examinations have been flawed, then those complaints should be raised by another habeas corpus proceeding setting forth that argument as grounds for release.

Additionally, I cannot agree with the majority's unsupported conclusion, *ante* at 903, that during the rehospitalization hearing the patient must be afforded the right to counsel. Even in parole revocation hearings, the United States Supreme Court has not gone so far as to say that counsel is always required. In a similar context, the court has stated that parole revocation hearings are not criminal proceedings and that the right to counsel in those proceedings must be determined on a case by case basis, with presumptions in favor of counsel in only certain designated cases. *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *see also Wainwright v. Cottle*, 414 U.S. 895, 94 S.Ct. 221, 38 L.Ed.2d 138 (1973).

As the majority recognizes, rehospitalization of a mental patient does not demand as stringent procedural proceedings as does parole revocation, *ante* at 898, 900–902. Indeed, rehospitalization is more removed from the label of "criminal proceedings" than is parole revocation. Since rehospitalization is a civil proceeding, rather than a criminal one, the right to counsel must be determined with regard to the balancing test recently set forth in the United States Supreme Court decision of *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). The majority has not even attempted such an analysis. Even under *Lassiter*, however, the court continued in its recognition of the holding in *Gagnon v. Scarpelli, supra*, that probationers and parolees have no *per se* right to appointed counsel at revocation hearings, 101 S.Ct. at 2159; and the *Lassiter* court even followed that holding by concluding that there was also no *per se* right to appointed counsel in the particular circumstances presented there. Certainly the same is true of mental patients subject to rehospitalization. I must therefore also dissent from the majority's conclusion that mental patients are entitled to counsel at rehospitalization hearings.

SHEPARD, J., concurs.