736 P.2d 1277

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Robert A. CHILTON,
Defendant-Appellant.**

No. 16220.

Supreme Court of Idaho.

Feb. 5, 1987.

Rehearing Denied May 19, 1987.

Charles Johnson III, Pocatello, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., and Myrna A.I. Stahman, Deputy Atty. Gen. (argued), Boise, for plaintiff-respondent.

HUNTLEY, Justice.

Robert Chilton appeals the trial court's order denying him a discharge or conditional release from a mental hospital. Chilton alleges the trial court applied an improper legal standard by placing the burden of proof on him to prove: (1) he could be released without danger to himself or others, and (2) that he was no longer mentally ill. Chilton also argues the trial court improperly concentrated on Chilton's alleged past criminal record, alleged refusal to accept that he was mentally ill, and alleged refusal to accept treatment in reaching its decision.

At a trial in September 1981, Chilton was found not guilty by reason of mental disease and defect of forcible rape, two counts of the infamous crime against nature, possession of a firearm during the commission of a felony and first degree kidnapping. Upon his acquittal, Chilton was committed to State Hospital South in Blackfoot, Idaho, and assigned to "Hoover Four," the intermediate security facility which provides the maximum security available at the hospital. For a number of years, Chilton refused to acknowledge his mental illness and actively refused anti-psychotic medication. Around the beginning of 1984, Chilton agreed to start taking anti-psychotic medication and was moved off "Hoover Four" to a minimum security section of State Hospital South. Chilton has apparently made steady progress as a result of the medication, and most of the psychiatrists, clinical psychologists and others working with Chilton now advocate his conditional release to a less structured environment, such as a shelter home, provided he remains on medication.

Despite those recommendations, the trial court ruled that Chilton had failed to show that he could be released under either of two statutory standards: first, it could not be shown that Chilton could be released without danger to himself or others (the standard required under I.C. § 18–214(2) (repealed), which statute Chilton was committed under) and second, Chilton did not show that he was no longer mentally ill nor likely to injure himself or others (a standard required under I.C. § 66–337(b), enacted after the repeal of I.C. § 18–214). The trial court based its decision, in large part, upon reports it ordered pursuant to I.C. §§ 66–337 and 18–214 (repealed), by doctors Lamarr Heyrend and Michael Estess. Dr. Heyrend expressly stated that, in his

opinion, Chilton is not ready for conditional release as he persists in stating that he is not mentally ill and remains unwilling to recognize the necessity for treatment. Additionally, that report mentioned the uncooperative attitude with which Chilton currently receives his medication. While Dr. Estess is of the opinion that Chilton might succeed in a less structured environment, he emphasized that any success would depend entirely upon Chilton's continued receipt of medication and treatment and cooperation with an out-patient treatment program. All experts who testified at the hearing stated that Chilton still refuses to acknowledge the reason for his commitment, refuses to accept the diagnosis of his illness and continues to object to the necessity of taking medication. The court also emphasized its own observations of Chilton's demeanor and attitude during the hearing, stating:

> "The hearing was relatively brief. The defendant [Chilton] appeared indifferent at first, but quickly became impatient as the hearing continued. He became quite agitated at the slightest negative testimony, interrupting several times with outbursts of disagreement with statements offered. Finally, in a bizarre incident, he waved a white handkerchief as though in surrender, during the prosecutor's closing. The court is satisfied that the clearly expressed reservation of Dr. Heyrend and the implied reservation of Dr . Estess are well founded. The defendant demonstrated no appreciation for the necessity of his treatment, the existence of his medical condition, nor a willingness to abide by any terms of a conditional release. It appears to the court that the defendant might view a relaxation of the conditions of his commitment as a license to abandon further treatment, including the necessary medication. Since, without medication, it has been demonstrated that the defendant's mental disease quickly reverts to a psychotic condition, *and since in that condition the defendant poses a significant danger to himself and others,* the court is not satisfied that the defendant is eligible for conditional release at this time." (Emphasis added).

The trial court concluded that Chilton had failed to meet his burden of proof of showing he could be released without danger to himself or others, the standard required by I.C. § 18–214 (repealed), and had *also* failed to show he was no longer mentally ill nor likely to injure himself or others, the standard required by I.C. § 66–337, and therefore should not be conditionally released. Chilton was involuntarily committed pursuant to I.C. § 18–214 (repealed), which in addition to providing for the commitment of criminal defendants acquitted on the ground of mental illness also specified hearing procedures for the conditional release of those so committed.

**"18–214. Commitment of acquitted defendant—conditional release—revocation of release within five years.—**

(1) When a defendant is acquitted on the ground of mental disease or defect excluding responsibility, the court shall order him to be committed to the custody of the director of the Department of Health and Welfare to be placed in an appropriate institution for custody, care and treatment.

. . . .

(3) If the court is satisfied by the report filed pursuant to paragraph (2) of this section and such testimony of the reporting psychiatrist as the court deems necessary that the committed person may be discharged or released on condition without danger to himself or others, the court shall order his discharge or his release on such conditions as the court determines to be necessary. If the court is not so satisfied, it shall promptly order a hearing to determine whether such person may safely be discharged or released. Any such hearing shall be deemed a civil proceeding and the burden *shall be upon the committed person to prove that he may safely be discharged or released. ...*" (Emphasis added) (repealed).

By contrast, I.C. § 66–337, although it expressly pertains to patients admitted under § 18–214 (as well as other involuntary

patients) does not specify on whom the burden of proof of showing fitness to release lies. The trial court's apparent confusion as to which code section to apply, and its resultant application of *both* legal standards for release found in the sections stems, no doubt, from the paucity of instruction regarding conditional release hearings found in I.C. § 66–337.

Chilton raises several contentions on appeal. First, that the trial court incorrectly relied on the report of Dr. Heyrend since it had not been formally admitted into evidence, thereby precluding Chilton's right to cross-examine. Second, that the trial court incorrectly placed on Chilton the burden of proving both that he could be released without danger to himself and to others, and that he was no longer mentally ill nor likely to injure himself or others. We address each issue in turn.

### THE HEYREND REPORT

The reports of Dr. Lamarr Heyrend and Dr. Michael Estess were ordered pursuant to I.C. § 66–337(c) which provides in relevant part:

> "[U]pon motion of an interested party or the court on its own motion, the court shall determine whether the conditions justifying such release exist. In making such determination, the court may order an independent examination of the patient...."

At the onset, it is simply inconsistent for Chilton to urge that it was improper for the trial court to consider the Heyrend report while at the same time moving this Court to consider the Estess report, which also was not formally introduced into evidence during the open hearing. Regardless, we hold that I.C. § 66–337 contemplates just such use of independent examination reports by the court as was done in this instance.

Neither report was formally admitted into evidence at the conditional release hearing. Chilton did not object before the trial court to the use of the reports, but now contends that the trial court's utilization of the Heyrend report violates his right to cross-examine Dr. Heyrend as

guaranteed by the confrontation clause of the United States Constitution (U.S. CONST. 6th Amend.) and the Idaho Constitution (ID. CONST. art. 1, §§ 1, 13, 18). While ordinarily Chilton's position would be well taken, conditional release hearings pursuant to I.C. § 66–337 are unique. As mentioned, that statute specifically provides that the court may order an independent examination of the patient. The statute, therefore, clearly contemplates the judicial utilization of reports received as a result of such "independent examination."

Chilton also alleges that he was never aware that the trial court would consider the Heyrend report until after the hearing concluded. However, I.C. § 66–337(c) specifically allows that the court *may* release a patient, without a hearing, on the basis of such reports.

**66–337. Review, termination of commitment and discharge of patients.—**

. . . .

(c) Upon notification of intention to release from an inpatient facility either a patient admitted under section 18–214, Idaho Code, acquitted of criminal charges filed prior to July 1, 1982, on grounds of mental disease or defect, or committed pursuant to sections 18–212(3) and 66–329, Idaho Code, as unfit to proceed, and upon motion of an interested party or the court on its own motion, the court shall determine whether the conditions justifying such release exist. In making such determination, the court may order an independent examination of the patient. The cost of such independent examination must be borne by the party making the motion or, if indigent, the county having jurisdiction of the case. If no motion is made, the patient may be released according to the notice. (Emphasis added).

 Given this clear legislative intent allowing the trial court to make full use of reports in releasing a patient without hearing, we cannot hold that the trial court is precluded from even considering such reports as a supplement to a formal hearing. The legislative intent seems to be to provide the trial court with meaningful, expert

guidance—with or without the hearing process. We hold the trial judge is entitled to use reports ordered pursuant to I.C. § 66–337, regardless of whether the reports have been formally admitted into evidence; however, such entitlement is subject to the right of the committed to subpoena the doctors providing reports for cross-examination, should the committed acquittee so move.

Therefore, Chilton's argument that the trial court incorrectly relied on Dr. Heyrend's report in denying Chilton's conditional release fails.

## THE BURDEN OF PROOF IN CONDITIONAL RELEASE HEARINGS FOR INVOLUNTARILY COMMITTED PATIENTS

As we have already mentioned, the enactment of I.C. § 66–337 at the time of the repeal of I.C. § 18–214 has left numerous questions regarding the current status of hearing procedures applicable in conditional release hearings for involuntarily committed patients. I.C. § 66–337 simply does not provide the guidance § 18–214 did. Specifically, it articulates no standards as to burden of proof. Accordingly, the state urges that I.C. § 18–214, despite its repeal, continues to provide the burden of proof, it being upon the committed person. However, the plain meaning derived from a reading of the current statutes pertaining to both involuntary civil and criminal commitment indicate a legislative intent to treat both such patients (i.e. those civilly and criminally involuntarily committed) alike. I.C. § 66–317(c) provides in relevant part:

**66–317. Definitions.**

. . . .

(c) "Involuntary patient" shall mean an individual committed pursuant to sections 18–212, 18–214, 66–329 or 66–1201, Idaho Code, or committed pursuant to section 16–1610 or 16–1814, Idaho Code, and admitted to a facility for the treatment of minors.

It is noteworthy that that section treats those committed under I.C. § 18–214 and I.C. § 66–329 (the section pertaining to the involuntary civil commitment of mentally ill persons) identically. I.C. § 66–329 provides that the involuntary civil commitment of mental patients occurs by way of civil proceeding and requires the *state* to prove by clear and convincing evidence that the proposed patient is mentally ill and likely to injure himself or others, or is gravely disabled due to mental illness. As already noted, I.C. § 66–337 specifies no burden of proof, nor does it state whether civil or criminal procedures are to be followed during the hearing process. (As noted, I.C. § 18–214 did specify that the committed patient carry the burden of proving that he may safely be discharged or released pursuant to a civil hearing procedure). The state argues that this lapse of statutory instruction mandates the continued application of I.C. § 18–214 to those admitted pursuant to it. However, such argument ignores the legislature's *express* mention of those committed pursuant to I.C. § 18–214 in the text of I.C. § 66–337. That section provides in pertinent part:

**66–337. Review, termination of commitment and discharge of patients.**

. . . .

(b) The commitment of an involuntary patient shall be terminated if the patient is no longer mentally ill or is no longer likely to injure himself or others or is no longer gravely disabled; provided, that patients admitted under section 18–214, Idaho Code, acquitted of criminal charges filed prior to July 1, 1982, on grounds of mental disease or defect, or committed pursuant to sections 18–212(3) and 66–329, Idaho Code, as unfit to proceed, may not be released from an in-patient facility unless thirty (30) days before such release, the department director or his designee shall notify the committing court and prosecuting attorney of the contemplated release.

(c) Upon notification of intention to release from an in-patient facility either a patient admitted under section 18–214, Idaho Code, acquitted of criminal charges filed prior to July 1, 1982, on grounds of mental disease or defect, or committed pursuant to sections 18–212(3)

and 66–329, Idaho Code, as unfit to proceed, and upon motion of an interested party or the court on its own motion, *the court shall determine whether the conditions justifying such release exist.* In making such determination, the court may order an independent examination of the patient. The cost of such independent examination must be borne by the party making the motion or, if indigent, the county having jurisdiction of the case. If no motion is made, the patient may be released according to the notice.

■ In short, the plain language of I.C. § 66–337 bonds those committed under § 18–214 and § 66–329, and fails to distinguish altogether a separate procedure or burden of proof as between those involuntarily committed by a process civilly and those automatically committed as a result of criminal acquittal. It is important to note that confinement to a mental institution against one's will is a deprivation of liberty. *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979); *Application of True,* 103 Idaho 151, 154, 645 P.2d 891, 894 (1982). Such liberty interest is entitled to due process of law. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Application of True,* 103 Idaho at 154, 645 P.2d 891.

■ An involuntary commitment cannot constitutionally continue after the basis for it no longer exists. *O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975). In analyzing both the individual's and the state's interests during a release hearing, it is important to note that the confinement of an individual to a psychiatric hospital is a uniquely strong deprivation of liberty. (See *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1971). The import of this liberty interest cannot be underemphasized. Dissenting in *Jones v. United States,* 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983), Justice Brennan referred to "the massive intrusion on individual liberty that involuntary psychiatric hospitalization entails." *Jones,* 363 U.S. at 372, 103 S.Ct. at 3053–54.

■ The enormity of the liberty interest involved, coupled with the fact that this state's legislature has revealed that it has little or no interest in delineating upon whom the initial burden of proof lies during a conditional release hearing for those involuntarily committed under I.C. § 18–214 and has, in essence, abdicated its authority in this regard, makes us reluctant to read into the statutory scheme a further deprivation of a patient's liberty interest when we are not required to do so. Simply put, restrictions of liberty interests should intrude on such interest to the least extent necessary for the purposes of the restriction. *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). In this instance, the plain language of the statutes involved do not compel a further deprivation of Chilton's liberty interest by way of requiring that he bear the initial burden of proof at his conditional release hearing. In reaching this holding, we note that *Application of Downing,* 103 Idaho 689, 652 P.2d 193 (1982), is inapplicable to the situation before us. In *Downing,* we upheld as constitutionally permissible distinctions in the rights to hearing and judicial determination on the question of fitness for release for those committed pursuant to I.C. § 18–214 as opposed to I.C. § 66–329. We held that "once it has ... been established that the acquittee was dangerously mentally ill, a presumption arises that the defendant continues to suffer from that condition until he is able to prove otherwise." [Citations omitted]. *Downing,* 103 Idaho at 696, 652 P.2d 193.

However, *Downing* was decided at a time when I.C. § 18–214 provided expressly that the burden of proof be upon the committed acquittee and specifically addressed the constitutionality of I.C. § 18–214:

We ... hold that an accused who asserts the defense of mental disease or defect, and is acquitted on that basis, may be automatically committed to a mental institution without further hearing; that such automatic commitment does not violate the acquittee's rights to due process or equal protection because his dangerous mental condition has been estab-

lished by his own admission; *and that the committed acquittee thereafter bears the burden of establishing his right to release* by showing, pursuant to authorized procedures, that he is no longer dangerously insane. (Emphasis added) (Downing, 103 Idaho at 697).

■ I.C. § 18–214 is no longer effective. If it were, *Downing* would be the controlling case law. As it is, we do not have to address the constitutionality of any particular statute. Rather, we have only to recognize that we should not impinge on a committed acquittee's liberty interest when the state's sound interests (as exemplified by statute) do not require any impingement. *Shelton*, supra.

■ Accordingly, the trial court erred in stating that "the burden is on the defendant to demonstrate that society will not be jeopardized by his release...." However, while the trial court applied what we now hold to be an incorrect burden of proof, we do not, on that basis, reverse its finding. The record is replete with evidence justifying the trial court's conclusion that "the defendant poses a significant danger to himself and others" if he goes without medication. The record further indicates that the defendant "demonstrated no appreciation for the necessity of his treatment ... nor willingness to abide by any terms of the conditional release." As the evidence relied upon by the trial court was competent and sufficiently weighty to sustain the state's initial burden of proof in any event, we hold that the trial court's failure to apply the proper burden of proof was harmless error. I.R.C.P. 61. Affirmed.

DONALDSON, C.J., concurs.

BAKES, J., concurs in the result.

SHEPARD, Chief Justice, specially concurring in the result.

I concur in the result obtained by the majority, however I must express my disagreement with what I view as gratuitous dicta in the majority which find error in the trial court conclusion that "the burden is on the defendant to demonstrate that socie-

ty would not be jeopardized by his release." I suggest that such a holding by the majority is not necessary to the decision in this case, is not a necessary conclusion to be drawn from the statutes, and is not in accord with what the law has been in Idaho, or what the law ought to be in Idaho.

As noted by the majority, after a trial on charges of rape, infamous crime against nature, and kidnapping, to which Chilton pleaded not guilty by reason of mental disease, the jury found him not guilty by reason of mental disease and defect. Thereafter, the court entered judgment of acquittal and found that Chilton was in need of supervision, evaluation, treatment and care, that he presented a substantial risk of physical harm to other persons, that Chilton was dangerous to such a degree that a maximum security facility was required, and committed Chilton to the custody of the Department of Health and Welfare. That commitment was under the provisions of then I.C. § 18–214, which has now been repealed.

As noted in the majority, I.C. § 66–337 provides that the commitment of an involuntary patient should be terminated if he is no longer mentally ill, *or* is no longer likely to injure others. The statute further provides that patients admitted under I.C. § 18–214, as was Chilton, may not be released from a facility without notification to the committing court and the prosecuting attorney, of a contemplated release. Thereafter, the statute provides that such court, on its own motion or that of an interested party, shall determine whether the release is justified, and that the court in making such determination may order an independent examination of the patient. From that statutory language the majority holds that the burden of proof has shifted from the defendant to the State, albeit no notification of intended release was received by the court from the institution, but rather Chilton initiated the petition himself, and in the ordinary course of events would presumably bear the burden of proving his allegations.

*Applications of Downing*, 103 Idaho 689, 652 P.2d 193 (1982), was a wide and

sweeping decision in the area of the commitment of persons who pleaded and were found not guilty of a crime by reason of mental disease or defect. The Court there noted there, that as in the instant case,

> In our view, the fact that a defendant asserts the defense of mental disease or defect is of itself sufficient to authorize commitment automatically upon acquittal by reason of mental disease or defect. By pleading an insanity defense, the defendant admits not only mental responsibility, but also the commission of the act upon which prosecution is based.

The majority dismisses the *Downing* decision out of hand on the basis that the statute under which Downing had been committed, and sought his release, has since been repealed. My reading of *Downing* is different. I.C. § 18–214 was indeed implicated, but as the Court stated, only to the extent that "we must determine whether the release provisions of I.C. § 18–214 provide the appellants with adequate opportunity to rebut the presumption that their dangerous mental condition continues." The Court stated:

> We therefore hold that an accused who asserts the defense of mental disease or defect, and is acquitted on that basis, may be automatically committed to a mental institution without further hearing; that such automatic commitment does not violate the acquitee's rights to due process or equal protection because his dangerous mental condition has been established by his own admission; and that the committed acquitee thereafter bears the burden of establishing his right to release by showing pursuant to authorized procedures, that he is no longer dangerously insane.

Thereafter the Court went on to quote from the case of *Chase v. Kearns*, 278 A.2d 132 (Me.1971), which held that an acquittal because of mental defect or disease,

> ... puts such a defendant into an exceptional class. The special interest which the public has acquired in the confinement and release of people in this exceptional class results from the fact that there has been a judicial determination

that they have already endangered the public safety and their own as a result of their mental conditions as distinguished from people civilly committed because of only potential danger.

In the instant case the trial judge held, in my view correctly:

> However, this commitment arises out of a serious criminal charge, and therefore the standards for release must take into account the interests of society as well as the interests of the defendant. The burden is on the defendant to demonstrate that society will not be jeopardized by his release, and that issue must take precedence over what might be in the best interest of the defendant.

Here, as noted by the majority, the record reflects the variety of reasons why Chilton should not be released. The majority opinion upholds the decision of the district court denying the release of Chilton, but then proceeds to, in my view, unnecessarily overturn the decision in *Application of Downing, supra*. Therein I believe the majority errs.

BAKES, J., concurs.

BISTLINE, Justice, concurring and dissenting.

I concur with that part of the majority opinion concerning the burden of proof, but dissent from a result which does not reverse and remand for a new hearing. My primary concern is that the district court erroneously relied on hearsay reports not introduced in evidence at the evidentiary hearing. Nor can I agree with the assertion that misplacing the burden of proof in circumstances as these can be held to be harmless error. A detailed history of Chilton's experiences in the courts, Part I, will serve to explain the rationale of my dissenting from the majority's disposition of this case, Part II.

## I.

At oral argument counsel for Chilton made it abundantly clear that the primary issue for our consideration was the contention that the trial court could not properly

rely upon the hearsay statements of Dr. Heyrend and Michael Estess. As noted in the majority opinion, these reports were ordered by the trial judge pursuant to the provisions of I.C. § 66–337, and also under the provisions of former I.C. § 18–214, which was repealed effective July 1, 1982. Section 18–214 was a part of the Idaho Criminal Code which was in effect at the time of the criminal conduct which led to the charges which were filed against Chilton. Under that Code as it then existed, the situation facing a defendant not mentally sound was quite protective. By the provisions of § 18–207 a person was declared not responsible for criminal conduct if at the time of such conduct he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Section 18–208 provided for the admissibility of evidence that the defendant suffered from a mental disease or defect when relevant to the defendant's state of mind where state of mind was an element of the offense charged. Section 18–209 declared mental disease or defect precluding responsibility to be an affirmative defense which the defendant should timely raise by filing written notice of intent to rely thereupon.

Upon the notice being filed, the court was required under § 18–210 to appoint, or alternatively, to request the Department of Health and Welfare to designate at least one qualified psychiatrist to examine and report upon the defendant's mental condition, provided for not exceeding 60 days commitment of the defendant for the purpose of such examination, and provided further that the defendant could retain a psychiatrist to participate in the examination. That same section spelled out the manner and specifications of the examination, and the requirements of the report, including where required by court order an opinion of the examiner on the capacity of the defendant to have the particular state of mind which is an element of the particular charged offense—the report to be filed in triplicate with the court clerk who in turn serves a copy on the prosecutor and on the defense attorney.

Under § 18–212 of the now repealed Criminal Code provisions, when the defendant's fitness to proceed was called in question, as is provided for in § 18–210, that issue was to be *first determined by the court*, either upon the basis of the report or reports filed by the psychiatrist or psychiatrists, without hearing unless requested by one or both parties, and on request following hearing before the court.

Chilton's offenses were alleged to have taken place on January 6, 1981. Following some discovery by defense counsel on February 12, 1981, defendant's counsel gave notice of affirmative defense, § 18–209, and in the same instrument notice that the defendant lacked capacity to assist in his own defense, § 18–210. Of significance, that notice provided also the following:

> The Defendant is currently civilly committed to the Idaho State Security Medical Facility under court order and upon a court finding that he is mentally ill and dangerous; .... R., p. 14.

The magistrate's order, declaring itself acting under the provisions of § 18–211 of the Criminal Code and also on § 66–1304(c) of Title 66 of the Idaho Code, General Laws, ordered that defendant be detained at the Idaho Security Medical Facility "for a psychiatric examination and evaluation of the Defendant's competency to stand trial and his criminal responsibility at the time of the alleged offense." R., p. 16. The order did not designate a psychiatrist, and it did not direct the Department of Health & Welfare to designate a psychiatrist.

The last above-mentioned order of the magistrate court was dated February 24, 1981, but not filed until March 4, 1981. That delay not appearing to be of any moment, other than to bring into play the § 18–211 requirement that the defendant's confinement in the Idaho Security Medical Facility would expire in 60 days unless extended by court order. Sixty days would have expired no later than March 4.

With a complete absence of any psychiatric report or any order of the court in the record, the defendant, on June 2, 1981, was brought before the magistrate almost five full months later for the constitutionally

required preliminary hearing, and held to answer in district court for five separate felonies—all alleged to have taken place on January 6, 1981. An information was filed in district court on June 15, 1981. On arraignment two days later, defendant's plea of not guilty was entered, and the charges set for trial on September 21, 1981, bond being set at $15,000.

On August 20, 1981, at a hearing on defendant's motion for bond reduction, according to the minutes of the court, "Letters of July 14, 1981 and June 26, 1981 were made available to counsel." Perhaps, but only perhaps, these two letters may have been the long-overdue psychiatric evaluation of defendant judicially requested of the Department of Health & Welfare.[1] Nothing else at that hearing transpired other than that bond was continued in the same amount.

Just a scant three days before the date set for trial, the district court convened to hear a defense motion for acquittal by reason of mental defect or disease, and an alternative motion for a continuance. We are furnished with no transcript of that proceeding. Instead, we have a most uninformative court minute entry:

> Defendant not transported. Counsel present.
>
> Defense counsel comments and informs the Court that he just received the case from Mr. Rolf Kehne and relies on report from Doctor Estess on his motion for mental disease and defect and requests continuance of trial to prepare for case if the Court does not grant his motion for acquittal.
>
> State objects to continuance.
>
> Court *DENIES* Motion for Continuance.
>
> State comments in objection of Motion for Acquittal as to mental disease and defect.
>
> Comments by Court and counsel.
>
> Court rules that there is inadequate time to have an evidentiary hearing and *DE-*

*NIES* Motion for Acquittal as to Mental Disease and Defect without prejudice.

> Defense counsel informs the Court that the Defendant objects to the mental disease and defect defense but as counsel will decide whether to use the defense or not.
>
> State counsel to prepare order. R., p. 36.

In accordance with the trial court's bench ruling, and without the court having complied with former § 18–212 by either conducting any hearing as required therein, defendant's trial commenced on September 21, 1981, at 9:00 a.m. and concluded with a jury verdict just before 10:00 p.m. on September 22. That verdict was: "Not Guilty by Reason of Mental Disease and Defect." We are not favored with any transcript of the trial. Defense counsel, notwithstanding the trial court's refusal to conduct a § 18–212 hearing, was apparently allowed to submit the mental disease or defect defense to the jury. This is illustrated by the court minutes which are in the record—from which two things are ascertained. First, and a curiosity, the prosecutor objected to the defendant's taking the stand because of his mental disease and defect. After the court denied the objection, Chilton did testify, but on cross-examination, the prosecutor's questions were objected to and the objection sustained. Second, Dr. Michael Estess testified as a defense witness, and underwent cross-examination. Thirteen exhibits were admitted, none of which shows itself to be a report that Dr. Estess may have rendered.[2]

Defense counsel, having prevailed on the affirmative defense, did not see any grounds or reasons for appeal; hence, no appeal, and no transcript.

Almost a month after the jury verdict, on October 19, 1981, judgment of acquittal was entered. In that judgment the district court belatedly found from the trial evidence that Chilton, because of his mental state, was in need of supervision, evaluation, treatment, and care, and, hence, was a substantial risk of physical harm to other

---

1. *See* footnote 2, *infra.*

2. A June 19, 1985 letter from Dr. Estess to the trial court, Judge Durtschi, gives some indica-

tion that Dr. Estess had indeed reported to the court his findings on a 1981 examination which took place prior to his giving trial testimony.

persons and dangerous to such a degree that a maximum security treatment facility was required. Accordingly, he was ordered committed to the custody of the Department of Health & Welfare.

In December of 1982, present counsel for Chilton sought his conditional release under the provisions of former § 18–214.[3] On January 5, 1983, the district court ordered an evaluation as provided for in that section, and Dr. Estess and Dr. Dale Cornell, duly qualified psychiatrists, were appointed to examine him and report to the court:

3. Section 18–214 provided:

**Commitment of acquitted defendant—Conditional release—Revocation of release within five years.**—(1) When a defendant is acquitted on the ground of mental disease or defect excluding responsibility, the court shall order him to be committed to the custody of the director of the department of health and welfare to be placed in an appropriate institution for custody, care and treatment.

*DIRECTOR'S APPLICATION*

(2) If the director of the department of health and welfare is of the view that a person committed to his custody, pursuant to subsection (1) of this section, may be discharged or released on condition without danger to himself or to others, he shall make application for the discharge or release of such person in a report to the court by which such person was committed and shall transmit a copy of such application and report to the prosecuting attorney of the county from which the defendant was committed. The court shall thereupon appoint at least two (2) qualified psychiatrists to examine such person and to report within sixty (60) days, or such longer period as the court determines to be necessary for the purpose, their opinion as to his mental condition. To facilitate such examination and the proceedings thereon, the court may cause such person to be confined in any institution located near the place where the court sits, which may hereafter be designated by the director of the department of health and welfare as suitable for the temporary detention of irresponsible persons.

*Court may discharge or court may require hearing*

(3) If the court is satisfied by the report filed pursuant to subsection (2) of this section and such testimony of the reporting psychiatrists or licensed psychologists as the court deems necessary that the committed person may be discharged or released on condition without danger to himself or others, the court shall order his discharge or his release on such conditions as the court determines to be necessary. If the court is not so satisfied, it shall promptly order a hearing to determine whether such person may safely be discharged or released. Any such hearing shall be deemed a civil proceeding and the burden shall be upon the committed person to prove that he may safely be discharged or released. According to the determination of the court upon the hearing, the committed person shall thereupon be discharged or released on such conditions as the court determines to be necessary, or shall be recommitted to the custody of the director of the department of health and welfare, subject to discharge or release only in accordance with the procedure prescribed above for a first hearing.

(4) If, within five (5) years after the conditional release of a committed person, the court shall determine, after hearing evidence, that the conditions of release have not been fulfilled and that for the safety of such person or for the safety of others his conditional release should be revoked, the court shall forthwith order him to be recommitted to the custody of the director of the department of health and welfare subject to discharge or release only in accordance with the procedure prescribed above for a first hearing.

*COMMITTED'S APPLICATION*

(5) A committed person may make application for his discharge or release to the court by which he was committed, and the procedure to be followed upon such application shall be the same as that prescribed above in the case of an application by the director of the department of health and welfare. However, no such application by a committed person need be considered until he has been confined for a period of not less than six (6) months from the date of the order of commitment, and if the determination of the court be adverse to the application, such person shall not be permitted to file a further application until one (1) year has elapsed from the date of any preceding hearing on an application for his release or discharge.

(6) If a defendant escapes from custody during his confinement, the director shall immediately notify the court from which committed, the prosecuting attorney and the sheriff of the county from which committed. The court shall forthwith issue an order authorizing any health officer, peace officer, or the director of the institution from which the defendant escaped, to take the defendant into custody and immediately return him to his place of confinement.

[S]aid Defendant having now made application for a conditional release pursuant to Section 18–214, Idaho Code;

IT IS HEREBY ORDERED, pursuant to the provisions of Section 18–214, Idaho Code;

(1) That Dr. Michael E. Estess and Dr. Dale D. Cornell, duly qualified psychiatrists, be and hereby are appointed to examine and report upon the mental condition of the defendant. The report of the examination shall include an opinion as to:

(a) Whether the defendant may be conditionally released without danger to himself or others and, if so, specifying any conditions which should be imposed to minimize danger to himself or others; or

(b) Whether the defendant cannot be released even conditionally without danger to himself or to others.

The psychiatrists shall make their report to the Court on or before April 4, 1983.

(2) That the Department of Health and Welfare make the defendant available in Boise, Idaho in any place designated by said Department as suitable for the temporary detention of the defendant, to facilitate the examination and report by the said psychiatrists.

(3) The appointment before Dr. Michael E. Estess if scheduled for February 2, 1983 at 1:00 P.M. The appointment before Dr. Dale D. Cornell is scheduled for February 3, 1983 at 11:00 A.M. R., pp. 56–57.

A hearing was held before the court on April 29, 1983, at which both Dr. Estess and Dr. Cornell were called as witnesses on behalf of Chilton, and examined, cross-examined, and examined on redirect.

The prosecutor called as witnesses a William P. Steflour, who is not identified in the court minutes, and also called Mr. Chilton for examination, presumably under the statute (or rule, whatever it may be now). On June 30, 1983, the court issued its memorandum decision:

This case is before the Court for decision on defendant's Motion for Conditional Release from a commitment under I.C. 18–214, (now repealed).

I was not satisfied from the required report of examination from the two psychiatrists appointed pursuant to I.C. 18–214(2) that the defendant could be released on condition without danger to himself or others. In accordance with the requirements of the statute an evidentiary hearing was therefore held.

By reference I incorporate the reports [4] of Dr. Michael E. Estess, M.D. and Dale D. Cornell, M.D., herein and make them a part hereof. In addition I make the following findings and conclusions.

The defendant suffers from a schizophrenic illness. Antipsychotic medication produces a remission in psychotic symptoms but in itself does not treat his behavioral problems.

Defendant lacks insight as to his illness and problems and is not cooperative in treatment. He resists the idea that he is mentally ill and needs medication; and, therefore, resists medication.

Because of defendant's resistance to medication he was taken off the medication for a time by the State Hospital staff. Although defendant is again on medication he has not returned to the level of remission he once had, and he has manifested acute psychotic symptoms. Although he has not been involved in any actual physical assault, he had a serious confrontation with another patient and generally manifests hostile, angry, intimidating, aggressive, demanding and otherwise inappropriate behavior.

Administration of appropriate medication alone is not sufficient to treat defendant's behavioral problems. In addition to medication and treatment of his behavioral problems, defendant needs to be supervised and monitored by someone skilled enough to recognize his level of remission and signs of regression.

4. The reports are not attached.

It is my conclusion that the defendant at this time constitutes a danger to himself and others and would do so if released to a more liberal or free environment than that provided by the State Hospital. In that regard, I note that my Order of Commitment does not dictate the level of care or placement within the institutions available to the department of Health and Welfare for placement of defendants committed under I.C. 18–214. My order leaves the actual placement and level of care within the institutions available to the Department in the discretion of the Director in the exercise of the Department's custodial duties.

For the foregoing reasons the defendant's Motion for Conditional Release is denied. R., pp. 60–62.

In July of 1984, other counsel made a run at gaining Chilton's conditional release, apparently believing it should be under § 66–337. Chilton signed the verified petition. The office of the attorney general responded on behalf of the Department of Health and Welfare:

The Department of Health and Welfare, custodian of Robert A. Chilton, moves for dismissal of the application for conditional release on file herein on the grounds: i) it is not accompanied by the report of a psychiatrist or licensed psychologist, ii) it fails to allege said Defendant is not likely to injure himself or others if so released and iii) the procedure of Section 66–337, *Idaho Code*, is available only to said Department and not to persons committed to it.

### BRIEF

Defendant was acquitted of charges on grounds of mental disease or defect excluding responsibility on October 19, 1981 and committed to said Department pursuant to Section 18–214, *Idaho Code*. Said section contains the exclusive method by which a defendant can petition for release, *vis.* upon application supported

by a psychiatrist or licensed psychologist recommending release and judicial finding that the Defendant is no longer likely to injure himself or others. 1980 S.L., Ch. 312 § 4, p. 797. Although Section 18–214 has been repealed (1982 S.L., Ch. 368, § 1, p. 925), such repealer is only effective as to criminal charges filed on or after July 1, 1982. 1982 S.L., Ch. 368, § 14, p. 919. There, the release provisions of Section 18–214 are still effective as to the Defendant herein.[5]

Similarly Section 66–337, *Idaho Code*, authorizes the Department of Health and Welfare to determine whether release is appropriate and give notice of contemplated release. No such determination has been made and the procedure is not expressly applicable to Defendant. Moreover, the release provisions of Section 66–337 were added by the same act that repealed Section 18–214 and is effective only as to criminal charges filed on or after July 1, 1984.[6] R., pp. 66–67.

The court agreed and that petition was denied, the court ruling on August 23, 1984 that:

I have concluded from review of the applicable statutes that the petitioner may not initiate a proceeding for conditional release under the provisions of I.C. 66–317(c). Only the Director may initiate and utilize the notice proceeding under that statute. It is apparent from the face of the application and the existing court records, which include the periodic reports from the State Hospital, that the Director has not initiated and does not approve or concur in the pending application.

It is further apparent from the allegations of the petition that the petitioner is not purporting to apply for release and discharge under I.C. 18–214 (now repealed but in effect at the time of the commitment and thus still applicable to petitioner) since he has not alleged the grounds for release under that statute

---

5. This underscored statement is the conclusion of Mr. Wickham, of counsel for the state. It appears to be a correct conclusion, but the 1982 repealer did not so state.

6. The effective date of § 66–337 was set at July 1, 1982.

nor sought to initiate the proceedings provided and required by that statute.

For the foregoing reasons the petition must be denied.[7] R., pp. 68–69.

Present counsel resumed the quest to obtain Chilton's discharge or conditional release, grounding the February 1985 petition on § 18–214, § 66–338(c), and/or § 66–329, or any statute that the court might direct. Again, the court appointed as psychiatric examiners Dr. Estess and Dr. Heyrend, who were directed to report on or before July 8, 1985, with the court scheduling one appointment for May 6, and the other on the following day. A hearing was held on August 14, 1985, this time before Judge McKee, Judge Durtschi having retired from the bench after appointing the two psychiatrists.

At the August 14, 1985 hearing, Mr. Johnson appeared for and with Chilton. Mr. Roger Bourne appeared for the State. Judge McKee convened the hearing at 11:30 a.m. and advised counsel as follows:

This is an evidentiary hearing pursuant to the Defendant's application under section 18–214(3) and also pursuant to the set provisions of section 66–337(c), Idaho Code.

Gentlemen, I have the file. I have reviewed the prior order by Judge Durtschi. I have the results of the evaluation that Judge Durtschi ordered from Dr. Estess and Dr. Heyrend. The purpose of the hearing is to provide the defendant with an opportunity to present what information that he has. Tr., Vol. 1, p. 1.

Nothing was said by the court regarding the reports of the two psychiatrists. Counsel for Chilton presented the testimony of Dr. VaLynn Mathie, who had been a psychiatric technician at Idaho Hospital South for fourteen months, and was well acquainted with Chilton. He testified that Chilton was quite capable of going out in the community if he had some help getting started again, that he did not believe Chilton to be dangerous to himself or others, indicating females, that he and his wife had young children, and that Chilton would be released to join the family at Thanksgiving and Christmas dinners.

Dr. LaGrande Smith, employed at Idaho State Hospital South as a psychologist since 1978, well acquainted with Chilton, stated that Chilton, provided he remained on medication, could function in a less restrictive environment than the hospital, and was not a danger to himself or others— which was a *concensus* of the hospital "team"[8] overseeing Chilton. He added that were Mr. Chilton under a civil rather than a criminal commitment, *we* would have already applied during the past several months for a release into a shelter home or foster care setting—both of which he described:

A. I'll start with the foster care. Foster care can vary. But basically it is a situation where an individual goes to live with another individual, such as a couple—or I should say individual or individuals, such as a couple or someone who is interested in supervising that person. And they assist to see that they continue to take their medications. They help them with their personal needs, including seeing that they eat properly and so forth.

A sheltered environment is one wherein the individual goes into a group setting of two or more people. And there they are cared for and supervised by the shelter home operators. Usually in those settings, their meals are prepared for them. Medications are monitored upon request of the mental health system in most of them. In Mr. Chilton's case, we would place him in one where we would request that and get that type of supervision. They do activities as a group in the sheltered homes. Many of them provide for day-care participation in the mental health system. And they transport their clients to and from the sheltered facility. So it's quite structured yet more freedom than what the

---

**7.** The court was correct as to the underscored portion.

**8.** Under examination by the court, he identified the team as himself, Dr. Cunningham, Marie Clark, Ted Christianson, Janet Wallace, John Wray, Lynn Thompson, and Betty Ferrin.

hospital offers, and basically a step in a direction of allowing them more freedom to function and make decisions on their own but with supervision.

The lodge type of a program, which is yet a different program, is still a group setting, but one where the group does things together and makes decisions, including money-making projects. They work together. They prepare and plan their meals together. They buy their food together. And they do have a lodge coordinator who works with them on a daily basis to provide some supervision, and helps them work together in that type of a setting. So that in the lodge setting, the clients actually have more responsibility, perhaps, to each other than in the sheltered setting, for example. Tr., Vol. 1, pp. 20–21.

He added that Chilton basically is in a stable condition and that they were not able to do any more to help him progress more than "where he's at at this point in time," and that he would place him in a shelter home.

The court examined Dr. Smith rather extensively, and asked him if he had had the opportunity of reviewing the opinions of Drs. Estess and Heyrend. The answer was no, that copies were not furnished. The following discourse took place:

"Q. This was of concern to Judge Durtschi in the last hearing, and it was of concern to the evaluating psychiatrist. Let me ask: In your observation of Mr. Chilton as a member of his treatment team, it appears in the past that there has been some difficulty with Mr. Chilton in accepting the necessity for his medication, that in the past there is some demonstration in prior correspondence and in recent opinions that Mr. Chilton has indicated that he is unwilling to continue on the medication, and has objected to the necessity of the medication. Can you offer the Court any comment on Mr. Chilton's attitudes in that area and the difficulties or the—what might be encountered if he were not in a more structured setting with regard to the continuation of medication?

"A. I can offer an opinion and some statements based on observation and communication with Mr. Chilton. The opinion is that his attitude has slightly changed in favor of taking the medication. It's my opinion that he probably has gained more insight into the need for taking the medication than what he used to have. There is still some potential for resistance, but then we're talking in terms that are not definite. And I could not predict that. I would hope that he would take it. I think that part of the process has been Mr. Chilton's own thinking, including trying to identify with different ideations, including some religious philosophies that say that medications aren't necessary. He has specifically told me that he has identified at one time or another with the Christian Science philosophy of not needing medications. My most recent conversation with him, in fact on the way for this hearing, was that he has now come to the realization that he will probably have to take the medication the rest of his life. It's my opinion that Mr. Chilton needs on-going encouragement and supervision in this matter and, therefore, the recommendation of outpatient involvement with mental health for that purpose.

"I don't know if that helps you or not.

"THE COURT: I don't either. But I appreciate the attempt. Counsel wish to inquire further?

"MR. JOHNSON: I would have a question or two.

## FURTHER DIRECT EXAMINATION
## BY MR. JOHNSON:

"Q. Mr. Smith, the medication that Mr. Chilton is presently on is administered through a shot, isn't it?

"A. It is.

"Q. And it's just once a week; is that correct?

"A. Yes.

"Q. So ideally in the outpatient situation, he would have an appointment at the community mental health center once a week to go in and get his shot?

"A. That's correct.

"Q. And if he didn't show up for the shot, of course, the matter could be looked into. If he wasn't provided with a shot within a day or two of that time, the Court or the authorities could be alerted to take the adequate precautions; would that be correct?

"A. That would be correct. In fact, what would happen, if we were able to place him into an alternate setting, we would discharge him from the hospital with a conditional release. And a part of those conditions would be a stipulation that he continue taking the medication with mental health supervision and follow-up. So there would be built right into that the opportunity to assess any violation of that and, again, have a hearing and place him right back in the hospital if there was a need.

"MR. JOHNSON: That's all I have.

FURTHER CROSS EXAMINATION
BY MR. BOURNE:

"Q. Is he on medication now?

"A. He is on medication now.

"Q. When did he have his last shot?

"A. Monday morning.

"Q. Does there seem to be a difference in the effect of the medication between the first day that it's given and the seventh day? Does it start to wear off, I guess is what I'm asking?

"A. Yes. There's a slight difference. There's perhaps a little bit more looseness of association immediately prior to receiving the shot.

"Q. What does that mean?

"A. That means that his thought processes and controls perhaps aren't quite as crystal clear and maybe as effective as they are during the maximum part. Unfortunately, there doesn't seem to be any one thing that will hold them absolutely stable day in day out. I suppose that's probably true for people not on medication, too, and those who are not in mental institutions. Their emotions play a part in it. But Mr. Chilton has functioned relatively well even during those periods of time.

"Q. Which period?

"A. The difference between day one and day six, for example.

"Q. The two psychiatrists that evaluated the defendant, June 19th, 1985, by Dr. Estess, and like May 7th, 1985, by Dr. Heyrend, was Mr. Chilton taking his medication on those days?

"A. June of '85?

"Q. Yes, June 19th.

"THE COURT: Counsel, that's the date of the letter. The evaluation was the—Dr. Estess saw him on May 6 and Dr. Heyrend saw him on May 7. The letters were dictated, as doctors often do, considerably later.

"Q. (By Mr. Bourne) Okay. So May 6 and May 7.

"A. It appears from the record that he took a Prolixin shot on May 2nd.

"Q. Is that in the same quantity that he's taking it now, half a cc I think I saw somewhere?

"A. No. That was 1.5 ccs; which is .5 ccs more than he is currently taking, I believe. Let me double-check that.

"Yes, he's currently taking 1 cc.

"I would like to point out that in testimony regarding this, I'm referring to the record. I'm not an M.D. And so I'm not qualified to speak to the medications, other than from the observations of the behavior and the result.

"Q. Dr. Smith, I've got to tell you that I'm concerned by your statement that you can't predict Mr. Chilton's dangerousness. And that's why, or at least in connection with that, you haven't applied for conditional release any time earlier than this. I've heard you say that you haven't observed any violence, that he seems to be doing reasonably well during a time that he's taking his medication. What do you mean you can't predict his dangerousness?

"A. Let me say this, let me put it in more qualified term. I believe that we can't predict his dangerousness based upon his criminal behaviors or charges. You know, I said before if he were on civil commitment, that we would have already sought a release from the hospital for him.

"Q. Even based upon the crime he committed?

"MR. CHILTON: I didn't commit that crime.

"A. Yes. If he were on civil commitment, we would have.

"Q. (By Mr. Bourne) Aren't you the least bit concerned about his prior actions?

"A. Of course, we are concerned about what Mr. Chilton or anyone for that matter would do. We have not observed any dangerous behavior from Mr. Chilton. And that may affect our willingness to suggest placing him in a shelter home or sheltered environment versus continued inpatient care at the hospital. And, again, we still can't predict that. And because of the 1800 code, which doesn't exist as it did when he was committed, we haven't sought that. Because it asks to out right state, I think, that wouldn't ever happen. And we don't know that. I don't think you could say that for any individual, that there would be an absolute. The probability, you can speak of, based upon his behaviors as we have observed them.

"THE COURT: Doctor, are you saying that as a matter of policy, then, in any instance of criminal commitment, the State would not recommend—would not initiate a recommendation for conditional release because of the language in the 66–337, that there's no likelihood of danger to himself or to others?

"WITNESS: Yes.

"THE COURT: That's a policy determination that has been made?

"WITNESS: That's correct. And if I'm not mistaken, I believe that was in the 1800 code, 18–214.

"THE COURT: That's now been superceded by?

"WITNESS: 66–329—3 something, anyway.

"Q. (By Mr. Bourne) Then does the State Hospital never recommend that in a criminal case?

"A. Well, I can't speak for that. I don't know.

"Q. Have you ever?

"A. No. I have recommended discharge as within this case. But I wouldn't be willing to say that there would be an absolute definite stipulation that the individual would never have problems.

"Q. But you do recommend discharge or a conditional release in criminal cases?

"A. Yes, in criminal cases, depends on the nature of the criminal case.

"Q. So that's not an absolute policy that you don't do that?

"A. It is not.

"Q. Okay.

"A. It varies from case to case.

"THE COURT: Further inquiry?

## FURTHER DIRECT EXAMINATION
## BY MR. JOHNSON:

"Q. Now, isn't it true that, if you know, that the American Psychiatric Association has come out with a policy statement that the best predictor of future dangerousness is in fact past actions? In other words, there is no way you by talking to a person can reach an opinion as to whether there's a propensity for future dangerousness?

"MR. CHILTON: Can I ask a question?

"A. That's a difficult question to respond to.

"MR. CHILTON: I think I need another lawyer.

"A. In our training, psychological, psychiatric training, we look for cues and clues to predict those things. But there is no absolute definite type of thing, other than if there is direct evidence and the individual is exhibiting behaviors and making statements that they'll do that kind of a thing.

"Q. And you haven't seen those kinds of behaviors?

"A. I haven't seen them in Mr. Chilton, but, again, couldn't predict with definite absolute certainty in any direction.

"Q. Now, in the earlier letter that Mr. Hoskisson wrote—

"MR. CHILTON: Or anybody.

"Q.—was the conditional release aspect of this case discussed or just the discharge of Mr. Chilton?

"A. Would you please repeat that question?

"Q. In the March 5th letter from Mr. Hoskisson to the Court, was the conditional release of Mr. Chilton or just the discharge without any conditions discussed, if you recall?

"A. Yes. To the best of my recollection, it was discussed. And the opinion was that Mr. Chilton would be applying for conditional release, and we would allow that process to run its course.

"MR. JOHNSON: That's all I have.

"MR. BOURNE: Nothing further.

"THE COURT: Thank you, Dr. Smith.

"Anything further, Mr. Johnson?

"MR. JOHNSON: No further witnesses.

"THE COURT: Do you have anything further?

"MR. JOHNSON: I have no further witnesses. I would like to make a statement.

"THE COURT: Does the State have any witnesses?

"MR. BOURNE: No witnesses.

"THE COURT: Very well. Mr. Johnson, you may proceed.

(Whereupon closing statements were made at this time.)

"THE COURT: Well, I'm going to take this under advisement. The matter that come up at the hearing today, I want to study further. So I will take the matter under advisement and render an appropriate decision in due course. The court is in recess." Tr., Vol. 1, pp. 32–41.

## II.

Because, as the opinion of Justice Huntley points out, "confinement to a mental institution against one's will is a deprivation of liberty," it seemed important to track Chilton's confinement from the inception. Chilton has been so confined for over six years, and numerous attempts to gain only a conditional release have been rebuffed. The due process to be accorded all persons seems not to have been his lot in life. In apparent violation of the statutory law, he was put to a jury trial (as was the jury and the county) when he was not accorded a court trial on his defense of mental defect. That error was cured, however, when the jury so acquitted him, and the court in turn also did so, but also placed him in strict confinement indefinitely.

In 1983 his efforts to be released under § 18–214 failed. Another attempt at release was made in 1984, but turned away because it was said by the state and the court that § 18–214 was still applicable, although repealed, and that § 66–337 was not applicable to Chilton.

In his most recent attempt to gain a conditional release from the district court, the district court utilized reports not in evidence as a basis for ruling against him. Those reports were before the court on the basis that the court may on the strength thereof release a person so committed. If the court does so decide, the reports have served their intended purpose. If the court decides otherwise, the reports again have served their purpose, and a hearing will be held to inquire into the matter—a civil proceeding.[9] Witnesses will be called, will be examined, and subjected to cross-examination. In the instant situation, two witnesses were called by Chilton, and examined extensively, with the court's questioning also bringing out the facts and the opinions involved. Neither party called Dr. Estess or Dr. Heyrend; neither party attempted to introduce the reports of either; nor did the court ask if there was any objection to making these reports a court exhibit—as we all know, and as was brought out at oral argument, this often takes place in Industrial Commission hearings. What is a sound practice there would be even more sound in the more formal arena of a district court trial. Most likely the trial bar

**9.** I do not disagree with the majority that it is erroneous to have a statute placing the burden of proof on a confined person.

will wonder at such a ruling as the majority makes this date.

All things considered, and being wholly unable to agree that the misplacing of the burden of proof in a civil trial can ever be harmless error, I find it imperative that the decision below be vacated and the cause remanded for another hearing. This, to those who are knowledgeable in this area of the law, may seem unnecessary where the law provides that Chilton is entitled to start in anew where the statutory once-a-year only requirement is not a bar. However, it cannot help but be prejudicial to Chilton that a series of efforts over five years have served to build up a record which, unless closely examined as I have done, demonstrates a continuing judicial determination that he must be kept in secure confinement, notwithstanding, over those five years, the following: error in putting him to a jury trial, error by one attorney in believing § 18–214 was inapplicable; error in relying upon reports not in evidence, and the authors thereof not subject to cross-examination; error in declaring as harmless the erroneous placing of the burden of proof; and evidence from those professionals who work with him on a daily basis that he is ready for a proper conditional release.